Carol HYRCZA, Executrix of the Estate of Margaret Mahunik, Deceased,

v.

WEST PENN ALLEGHENY HEALTH SYSTEM, INC.; Allegheny General Hospital; Suburban General Hospital Co., Inc.; Suburban General Hospital; Allegheny Integrated Health Group; Cranberry Medical Associates; Wexford Medical Practice; Hillary A. Stroud, M.D.; Bruce E. Conway, M.D.; Health South Corporation; Choicecare Physicians, P.C.; Yvette C. Ross Hebron, M.D.; Associated Neurologists–UPMC; Associated Neurologists, Inc.; Hassan Hassori, M.D.; and Jonathan E. Artz, M.D.,

Appeal of Yvette C. Ross Hebron, M.D., Choicecare Physicians, P.C.

Superior Court of Pennsylvania.

Argued Dec. 3, 2008.

Filed July 1, 2009.

Reargument Denied Sept. 11, 2009.

---

**9.** We note the death penalty is not unconstitutionally imposed upon a defendant who refuses to offer any mitigating evidence. *See Commonwealth v. Frey,* 588 Pa. 326, 904 A.2d 866, 874 (2006) (sentencer may not be precluded from considering mitigating evidence, but defendant is not constitutionally required to present mitigating evidence).

962

Ava M. Plakins, Doylestown, for Hebron.

Philip A. Ignelzi, Pittsburgh, for Hyrcza.

George L. Young, Philadelphia, for ChoiceCare.

BEFORE: FORD ELLIOTT, P.J., DONOHUE and COLVILLE *, JJ.

OPINION BY DONOHUE, J.:

¶ 1 Yvette C. Ross Hebron, M.D. ("Dr.Hebron") and ChoiceCare Physicians, P.C. ("ChoiceCare") (collectively, "Appellants") appeal from the January 3, 2008 order entering a judgment in the amount of approximately $8.6 million on a jury verdict in favor of Carol Hyrcza ("Hyrcza"), executrix of the estate of Margaret Mahunik ("the Decedent"), and against Appellants.[1] For the reasons that follow, we affirm.

¶ 2 The relevant facts and procedural history of this case were summarized by the trial court, the Honorable Kim D. Eaton presiding, as follows:

This wrongful death and survival action was brought on behalf of the [e]state of [Decedent], a 60–year–old woman with multiple sclerosis who died at Suburban General Hospital ["Suburban General"] on July 10, 2001. After undergoing successful hip surgery at Allegheny General Hospital ["Allegheny General"] on June 22, 2001, Decedent was admitted to the Rehabilitation Unit of [Suburban General] on June 27, 2001. [Suburban General] had an agreement with ChoiceCare to provide medical care for patients admitted to its Rehabilitation Unit. ChoiceCare assigned Dr. Hebron, [a] board certified physiatrist,[2] as Decedent's attending physician. On admission, Dr. Hebron entered an order to continue Decedent on Ecotrin, a form of aspirin, and Solumedrol, a form of steroid. She consulted with neurologist, Jonathan E. Artz, M.D. ["Dr. Artz"] and Dr. Morris, an internist with Decedent's general family group. Dr. Artz and Dr. Morris each saw Decedent one time on June 28, 2001. Dr. Hebron was the only physician who saw Decedent after June 28, 2001.

Decedent showed signs of gastrointestinal bleeding on July 4, 2004[sic] which went unnoticed by Dr. Hebron. Dr. Hebron's last day of employment with ChoiceCare was July 6, 2001. ChoiceCare did not assign another physician to care for Decedent. On July 8, 2001, Decedent experienced shortness of breath and was transferred to the Intensive Care Unit where she died two days later from massive gastrointestinal bleeding.

A[c]omplaint was filed in August of 2003 against numerous defendants, including Drs. Hebron, Artz, Stroud, Conaway and Hassari, their respective practice groups, [Allegheny General] and [Suburban General]. No cross-claims were filed by any of the defendants against

---

* Retired Senior Judge assigned to the Superior Court.

1. Dr. Hebron's appeal is docketed at 135 WDA 2008 and ChoiceCare's appeal is docketed at 136 WDA 2008. Upon review, we consolidate the appeals *sua sponte* as they raise nearly identical issues with the exception of one additional issue raised by ChoiceCare pertaining to corporate negligence and one additional issue raised by Dr. Hebron

pertaining to the propriety of a particular jury instruction.

2. Physiatry is the practice of physical medicine, which deals with non-operative orthopedics for, *inter alia*, knee, joint and back pain, and rehabilitative medicine, which deals with improving the function of persons with various disorders, such as hip fractures, neurological disorders, and spinal cord injuries. N.T., 3/22/07, at 113.

any other defendant. Shortly before trial, [Hyrcza] settled with Suburban, Drs. Stroud, Conaway and Artz and their practices ("Settling Defendants["] ). The court denied motions by Dr. Hebron and ChoiceCare to amend their answers to assert cross-claims against Settling Defendants. The court granted Settling Defendants' motion to be dismissed from trial.

[Hyrcza] proceeded to trial against Dr. Hebron and ChoiceCare ("Defendants"). [Hyrcza's] theory of liability against Dr. Hebron was that she breached the standard of care by prescribing and continuing Decedent on two medications which, in combination, are known to cause stomach bleeding, without taking appropriate precautions or monitoring her. [Hyrcza's] theory against ChoiceCare was that it was vicariously liable for the negligence of Dr. Hebron and directly liable for its own negligence. On March 30, 2007, the jury returned a verdict against Defendants, awarding $5,383,200 on the wrongful death claim and a $1,830,000 on the survival claim.[3] Motions for Post–Trial relief were denied. ChoiceCare filed a Notice of Appeal on January 8, 2008.

Trial Court Opinion, 5/8/08, at 1–4 (footnotes added).

¶ 3 On appeal, Dr. Hebron alleges that the trial court erred and/or abused its discretion by:

1. Dismissing the settling defendants from the courtroom and refusing to place their names on the verdict slip;

2. Overruling defense objections to the testimony of [Hyrcza's] expert on the ground that his qualifications were insufficient to render standard-

of-care opinions against [Dr. Hebron];

3. Overruling defense objections to the jury charge on irrelevant considerations, where such charge [was] plainly inaccurate and misleading to the jury;

4. Overruling defense objections and therefore permitting improper use of a learned treatise on the direct examination of [Hyrcza's] expert;

5. Denying defense counsel's request for cautionary instructions where comments by [Hyrcza's] counsel during final argument were inflammatory, scurrilous, and prejudicial and not based on any evidence adduced at trial; and

6. Failing to grant [Dr. Hebron's] request for remittur, as the verdict was so excessive as to shock the conscience.

Dr. Hebron's Brief at 4.

¶ 4 ChoiceCare raises the first, second, fourth, fifth and sixth issues on appeal (but not the third), and raises the additional claim that the trial court committed reversible error by charging the jury on its alleged corporate negligence. ChoiceCare's Brief at 4.

### Exclusion of Settling Defendants from Verdict Slip

¶ 5 For their first issue on appeal, Appellants claim the trial court committed reversible error by dismissing Suburban General, Doctors Stroud, Conaway and Artz, and their respective practices ("Settling Defendants") from trial and excluding them from the jury verdict sheet, despite clear evidence of their negligence. As a result, they contend that they were denied their right to have liability apportioned

---

**3.** The jury apportioned 1/3 of the liability to Dr. Hebron, and 2/3 to ChoiceCare. On January 3, 2008, the trial court entered judgment against Appellants in the amount of $8,606,099.87, which included delay damages.

among themselves and the Settling Defendants as joint tortfeasors. The Settling Defendants signed releases in accordance with the Uniform Contribution Among Tort-feasors Act ("UCATA"), 42 Pa.C.S.A. § 8321, *et seq.*[4]

¶ 6 A trial court's refusal to include a settling co-defendant on a verdict slip is reviewed for an abuse of discretion or an error of law. *Rose v. Annabi*, 934 A.2d 743, 745 (Pa.Super.2007). An abuse of discretion occurs when the course pursued by the trial court represents "not merely an error of judgment, but where the judgment is manifestly unreasonable or where the law is not applied or where the record shows that the action is a result of partiality, prejudice, bias, or ill will." *Id.* at 746.

¶ 7 In its written opinion submitted pursuant to Pa.R.A.P.1925(a), the trial court stated that it excused the Settling Defendants from trial and excluded their names from the verdict slip because Appellants had failed to establish a *prima facie* case of medical malpractice against these defendants. Trial Court Opinion, 5/8/08, at 4. We find the trial court's decision supported by *Herbert v. Parkview Hosp.*, 854 A.2d 1285 (Pa.Super.2004), *appeal denied*, 582 Pa. 710, 872 A.2d 173 (2005), in which this Court held that a profound lack of evidence against settling co-defendants could preclude the inclusion of those defendants on a jury verdict sheet.

¶ 8 In *Herbert*, the administratrix of the estate of a deceased patient brought suit against a number of defendants for medical malpractice. Prior to trial, one physician was dismissed from the case and the plaintiff settled with the hospital and another physician. These parties signed joint tortfeasor releases, leaving only one physician in the case. The sole issue at trial was the liability of this non-settling physician, although the names of the settling defendants were placed on the verdict slip. The jury apportioned 60% of the liability to the hospital, 30% to the settling physician, and 10% to the non-settling physician. Afterwards, the plaintiff filed a post-trial motion challenging the trial court's inclusion of the settling defendants on the verdict slip, thus allowing the jury to apportion liability to the settling defendants. The motion was denied.

¶ 9 This Court affirmed the trial court's decision to leave the settling defendants on the verdict sheet, stating that the relevant inquiry was *whether the evidence adduced was sufficient to warrant the jury apportioning any liability to the settling defendants.* Since the trial court included the settling defendants on the verdict slip, we stated that the issue was "whether the trial court abused its discretion in implicitly finding sufficient evidence to justify a jury finding that [the settling defendants] were partially liable for [the decedent's] harm." *Id.* at 1290.

¶ 10 In *Herbert*, this Court considered the applicability of *Davis v. Miller*, 385 Pa. 348, 123 A.2d 422 (1956), in which our Supreme Court held that a defendant had the right to keep a settling additional defendant at trial for purposes of apportioning liability. In *Davis*, the passengers of a car, following a car accident, sought damages against the driver of the other automobile involved, alleging that the accident was caused by his negligence. This driver

---

4. The UCATA states as follows: "A release by the injured person of one joint tortfeasor, whether before or after judgment, does not discharge the other tort-feasors unless the release so provides, but reduces the claim against the other tort-feasors in the amount of the consideration paid for the release or in any amount or proportion by which the release provides that the total claim shall be reduced if greater than the consideration paid." 42 Pa.C.S.A. § 8326.

filed a complaint to join as an additional defendant the driver of the first car, alleging that the accident was due to her negligence and that the jury might find her solely or jointly liable. Prior to trial, the additional defendant settled with the plaintiff, entered into a joint tortfeasor release, and was dismissed from the case. The defendant appealed, and this Court held that he had the right to keep the additional defendant at trial for purposes of apportionment under the UCATA. *Davis*, 385 Pa. at 352, 123 A.2d at 424 ("[additional defendant's] continuance in the case is ... necessary, even though no recovery can be had against her either by plaintiffs or by defendant, in order to determine the amount of damages that defendant may be obliged to pay plaintiffs ..."). Therefore, implicit in *Davis* was a finding that there was *at least some* evidence of liability on the part of the additional defendant to justify her inclusion on the jury verdict slip.

¶ 11 We also recognized *Ball v. Johns-Manville Corp.*, 425 Pa.Super. 369, 625 A.2d 650 (1993), *abrogated on other grounds, Baker v. ACandS*, 562 Pa. 290, 755 A.2d 664 (2000), in which we held that settling co-defendants *as to whom no evidence had been submitted at trial* were properly excluded from the jury's consideration of liability. The *Herbert* court, after considering the aforementioned cases, indicated that it agreed with the plaintiff that "under certain circumstances, a *profound lack of evidence regarding settling defendants* may preclude the inclusion of those defendants on the jury verdict sheet." *Herbert*, 854 A.2d at 1289 (emphasis added).

¶ 12 After reviewing all of the evidence presented at trial and resolving all conflicts in favor of the non-settling defendant, however, the *Herbert* court found that there was evidence of medical mal-

practice against the settling defendants, noting that the plaintiff's expert witness "*cast an equally damning light on the performance of every physician who had a hand in treating Decedent ...*" *Id.* at 1290 (emphasis added).

¶ 13 *Herbert*, *Davis* and *Ball* all make clear a trial court must determine whether any evidence of a settling co-defendant's liability exists before deciding whether to put that co-defendant on a jury verdict slip. If the evidence is insufficient to support a *prima facie* case against a settling codefendant, they make clear that such co-defendant may be left off the jury verdict slip. Therefore, we conclude that there is no absolute right to have settling co-defendants placed on a verdict slip, as Appellants appear to suggest. Accordingly, we proceed to an analysis as to whether the evidence in the instant case was sufficient to establish the elements of a *prima facie* case of medical malpractice against the Settling Defendants.

¶ 14 Appellants contend that they succeeded in bringing such a *prima facie* case against the Settling Defendants through cross-examination of the plaintiff's expert, Dr. John Corboy ("Dr.Corboy"). Specifically, they argue that Dr. Corboy, in his expert report and under cross-examination, attributed fault to "all physicians" involved in the Decedent's care for failing to recognize that a combination of aspirin and steroids would cause gastric bleeding. After review of the record, however, we conclude that these statements were made in the context of other statements which clearly singled out Dr. Hebron, as the Decedent's attending physician, as ultimately responsible for her death.

¶ 15 In its 1925(a) opinion, the trial court stated that:

In accordance with [*Herbert*] and [*Davis*], the court reviewed the evidence

against Settling Defendants at close of trial for the following elements of a medical malpractice claim: (1) that the medical practitioner owed a duty to the patient; (2) that the practitioner breached that duty; (3) that the breach was a proximate cause of, or a substantial factor in, bringing about the harm suffered by the patient; and (4) that the damages suffered by the patient were a direct result of the harm.

Dr. Corboy testified that Dr. Hebron breached the standard of care by prescribing aspirin and steroids together without taking precautions or monitoring Decedent for gastrointestinal bleeding. Dr. Corboy testified that Dr. Hebron, as the attending physician, *bore ultimate responsibility for the care of Decedent. She was medically, legally and ethically responsible for coordinating medical treatment for Decedent, including coordination of care, managing medications, calling consultations and making the ultimate decisions.*

\* \* \*

The breach of the standard of care in this case was not prescribing aspirin and steroids together. Nor was ignorance of the risk for gastrointestinal bleeding. The evidence established that Dr. Artz, Dr. Morris and Dr. Hebron all understood the risk. Rather, it was the failure to protect or monitor Decedent from that risk and the failure to recognize and address early signs of intestinal bleeding that was the proximate cause of the harm. *There was no evidence that any physician other than Dr. Hebron was under a duty to protect, monitor, recognize or treat Decedent for intestinal bleeding.*

Dr. Artz and Dr. Morris were each consulted one time upon her admission to the Rehabilitation Unit. At that time, she was recovering well from surgery and her MS was under control. According to the nurses' notes, in the days following the consultations, the Decedent grew paler each day, a recognized sign of intestinal bleeding. Dr. Hebron did not read the nurses notes and did not notice the pallor when she saw Decedent on July 4 or 5th. No one from ChoiceCare saw Decedent at all on the 6th, 7th, or 8th.

Dr. Corboy did not 'cast an equally damning light on the performance' of any of Settling Defendants. He testified that there are certain tests that Dr. Hebron as attending physician should have ordered to check for intestinal bleeding which she did not. He testified that she breached the standard of care by not providing Decedent with medication to protect her stomach. He testified that Dr. Artz set Decedent on a tapering dose of steroids which was appropriate.[5] Dr. Artz knew that patients on aspirin and steroids were at a higher risk of GI problems. He did not take into conjunction the interplay between these two medications on an ongoing basis for Decedent because he was called in for a single visit to manage her MS, her MS was under control and the interplay of all the medications being prescribed for Decedent was a matter for Dr. Hebron as the attending physician. At close of trial, there was not sufficient evidence of any of the elements of malpractice against Settling Defendants and their names were not submitted to the jury for apportionment.

---

5. On June 28, 2001, Dr. Artz entered an order tapering the Decedent off of intravenous Solumedrol, and replacing it with prednisone, an orally administered steroid. N.T., 3/26/07, at 74–75.

Trial Court Opinion, 5/8/08, at 6–8 (citations omitted) (emphasis added).

¶ 16 After reviewing the evidence, we agree with the trial court's findings. It was established at trial that on June 27, 2001, the Decedent was assigned to and came under the care of Dr. Hebron, the attending physician who coordinated her overall medical care while in the rehabilitation unit of Suburban General. N.T., 3/26/07, at 53–55. Upon admission, Dr. Hebron entered an order continuing the Decedent on Ecotrin and Solumedrol. Id. at 66. She then consulted with Dr. Artz, a neurologist, and Dr. Morris, an internist, both of whom saw the Decedent once on June 28th.[6] N.T., 3/23/07, at 243–44, 248, 309. Dr. Corboy testified that in a report dictated on the 28th and transcribed on the 29th, Dr. Artz noted that the Decedent had been on steroids for an excessive amount of time and recommended to "slowly take her off the Solumedrol" to prednisone, and then "wean her from the prednisone."[7] Id. at 246–49.

¶ 17 After June 28th, Dr. Hebron was the only physician who saw, examined or was in any way involved in the care of the Decedent until at least July 6th. Under cross-examination, Dr. Corboy likened Dr. Hebron's role as the "quarterback" who coordinated all of the Decedent's medications and her overall care, made ultimate decisions, and was "medically, legally and ethically responsible for everything that went on with that patient."[8] Id. at 232–33, 328. He also testified that given the combination of steroids and aspirin administered to the Decedent, it was within Dr. Hebron's standard of care as an attending physician to raise the issue of whether the two drugs, in combination, would have the potential negative effect of being gastric irritants. Id. at 254. He testified that nowhere in the record did Dr. Hebron hint or suggest at this potential issue. Id. Dr. Corboy also testified that had Dr. Hebron addressed this issue, there were a "number of things that she could have done," including monitoring the Decedent's blood counts or her stools for blood, but that there was no evidence that blood work had been requested or taken between the morning of June 28th until the Decedent's death, or that the Decedent's stools had been checked for blood. Id. at 256–58, 260–61. Dr. Hebron admitted as much herself. N.T., 3/26/07, at 97–98. Dr. Marc Duerden ("Dr. Duerden"), a board-certified physiatrist and another plaintiff's expert, reiterated the point that Dr. Hebron, as the Decedent's attending physician, was the "quarterback" and primary physician in charge of her care, and that it was her ultimate responsibility to coordinate such care and review all medications she was taking. N.T., 3/27/07, at 61–64.

¶ 18 Based on the foregoing, we conclude that the evidence failed to show that any of the settling defendants had a role in the Decedent's care after June 28th, or that they had the opportunity to monitor the concurrent administration of steroids and aspirin, check for any abnormal symptoms, and take any appropriate and/or corrective action. Between June 28th and

6. Dr. Stroud was unavailable to see the Decedent that day; therefore, the Decedent was seen by Dr. Morris, another physician in the same family practice group, who was not named as a defendant in this case. N.T., 3/23/07, at 309–10; N.T., 3/26/07, at 167.

7. Dr. Corboy testified that Dr. Artz's decision to slowly taper the dosage of steroids that the Decedent was on was "appropriate." N.T., 3/23/07, at 312.

8. Dr. Hebron herself admitted that as attending physician, she was "captain of the team" and responsible for coordinating the Decedent's care. N.T., 3/26/07, at 59–60.

July 8th, when the Decedent underwent cardiac arrest, Dr. Hebron and Choice-Care were solely responsible for her daily medical care. Appellants failed to establish through Dr. Corboy's testimony that Doctors Artz and Morris owed the Decedent a particular duty or that they breached any duty by consulting with Dr. Hebron and seeing the Decedent once, well before any symptoms or signs of gastrointestinal bleeding had manifested themselves, or that they directly caused or contributed to the Decedent's death in any manner. Therefore, we conclude that the trial court properly exercised its discretion under *Herbert* by excluding the settling defendants from the verdict slip, as there was insufficient evidence to establish that they would have been found liable had Hyrcza proceeded to trial against them.

### Admission of Expert Testimony re: Standard of Care

¶ 19 Next, Appellants argue that the trial court erred by permitting Dr. Corboy, a board-certified psychiatrist and neurologist, to testify as to the standard of care applicable to Dr. Hebron, a board-certified physiatrist. They argue that since he was neither substantially familiar with the applicable standard of care, nor practiced in a specialty that had a substantially similar standard of care, he was unqualified to render standard-of-care opinion as to Dr. Hebron under Section 1303.512 of the Medical Care Availability and Reduction of Error ("MCARE") Act, 40 Pa.C.S.A. § 1303.101, *et seq.*, which addresses the qualifications of expert witnesses in medical malpractice actions.

¶ 20 "Decisions regarding admission of expert testimony, like other evidentiary decisions, are within the sound discretion of the trial court," and "[w]e may reverse only if we find an abuse of discretion or error of law." *Smith v. Paoli Memorial Hospital,* 885 A.2d 1012, 1016

(Pa.Super.2005) (citation omitted). The issue regarding an expert's qualifications under the MCARE Act is, however, in essence a question of statutory interpretation, and therefore, our review is plenary. *Id.*

¶ 21 The MCARE Act provides, in relevant part, as follows:

§ 1303.512. Expert qualifications

(a) **General rule.**-No person shall be competent to offer an expert medical opinion in a medical professional liability action against a physician unless that person possesses sufficient education, training, knowledge and experience to provide credible, competent testimony and fulfills the additional qualifications set forth in this section as applicable.

(b) **Medical testimony.**-An expert testifying on a medical matter, including the standard of care, risks and alternatives, causation and the nature and extent of the injury, must meet the following qualifications:

(1) Possess an unrestricted physician's license to practice medicine in any state or the District of Columbia.

(2) Be engaged in or retired within the previous five years from active clinical practice or teaching.

\* \* \*

(c) **Standard of care.**-In addition to the requirements set forth in subsections (a) and (b), an expert testifying as to a physician's standard of care also must meet the following qualifications:

(1) Be substantially familiar with the applicable standard of care for the specific care at issue as of the time of the alleged breach of the standard of care.

(2) Practice in the same subspecialty as the defendant physician or in a subspecialty which has a substantially

similar standard of care for the specific care at issue, except as provided in subsection (d) or (e).

(3) In the event the defendant physician is certified by an approved board, be board certified by the same or a similar approved board, except as provided in subsection (e).

(d) Care outside specialty.-A court may waive the same subspeciality requirement for an expert testifying on the same standard of care for the diagnosis or treatment of a condition if the court determines that:

(1) the expert is trained in the *diagnosis or treatment of the condition, as applicable;* and

(2) the defendant physician provided care for that condition and such care was not within the physician's specialty or competence.

(e) Otherwise adequate training, experience and knowledge.-A court may waive the same specialty and board certification requirements for an expert testifying as to a standard of care if the court determines that the expert *possesses sufficient training, experience and knowledge to provide the testimony as a result of active involvement in or full-time teaching of medicine in the applicable subspecialty or a related field of medicine within the previous five-year time period.*

40 P.S. § 1303.512 (emphasis added).

¶ 22 The trial court stated, in its 1925(a) opinion, that it was "satisfied" that the post-operative care of a multiple sclerosis patient having undergone hip surgery—and specifically, the precautions necessary when the patient was prescribed aspirin and steroids at the same time—was a matter within Dr. Corboy's training, "regardless of his specialty." Trial Court Opinion, 5/8/08, at 10–11.

¶ 23 It was established at trial that after graduating from medical school in 1985, Dr. Corboy completed an internship in internal medicine and a residency in neurology. N.T., 3/23/07, at 200–01. Afterwards, he completed a post-doctoral fellowship with clinical expertise in multiple sclerosis. *Id.* at 203. He testified that he is board-certified in both psychiatry and neurology, and currently practices and teaches neurology at the University of Colorado with a focus on multiple sclerosis and related disorders. *Id.* at 204–05, 207, 212–13. Dr. Corboy testified that he organized the Multiple Sclerosis Center at the university in 1997 and has since acted as its head, treating between 3,000 and 4,000 multiple sclerosis patients, over a hundred of whom had undergone rehabilitation. *Id.* at 207–08, 213, 217. Dr. Corboy also testified that he authored multiple scholarly articles on multiple sclerosis and was appointed as the course director for multiple sclerosis cases by the American Academy of Neurology in 2006. *Id.* at. 221–22. He testified that steroids were the primary drug prescribed to treat multiple sclerosis attacks, and that he frequently prescribed steroids, including Solumedrol and prednisone, which were used to treat the Decedent. *Id.* at 217–18, 292–94, 292–93. Further, Dr. Corboy testified that his patients oftentimes undergo surgery and that he is involved in their post-operative treatment and rehabilitation. *Id.* at 214–17. He testified that such patients often require Ecotrin or other types of aspirin to prevent blood clotting or deep vein thrombosis, and that he is familiar with the risks involved when aspirin and steroids are prescribed together. *Id.* at 235–42.

¶ 24 The trial court accepted Dr. Corboy's testimony that he was familiar with the standard of care at issue—the treatment of multiple sclerosis patients undergoing rehabilitation—as a significant portion of his practice was devoted to such

care. We decline to disturb its determination, as it is supported by facts of record. *See, e.g., Smith,* 885 A.2d 1012 (general surgeon, oncologist and internist permitted to testify against gastroenterologists as to failure to order a CT scan for patient with obscure gastrointestinal bleeding where each testified that they were actively involved with treating patients suffering from gastrointestinal bleeding and cancers); *Campbell v. Attanasio,* 862 A.2d 1282 (Pa.Super.2004), *appeal denied,* 584 Pa. 684, 881 A.2d 818 (2005) (psychiatrist permitted to testify as to the negligent use of an oral sedative by a third-year resident in internal medicine upon a patient with severe anxiety where witness had prescribed the particular sedative on multiple occasions to individuals who suffered from anxiety); *see also Gartland v. Rosenthal,* 850 A.2d 671 (Pa.Super.2004), *appeal denied,* 594 Pa. 705, 936 A.2d 41 (2007) (neurologist qualified to testify as to the standard of care for a radiologist reading a CT scan of the brain where the specific treatment at issue was the failure to report on the possibility of a tumor and recommend an MRI).

¶ 25 Additionally, Dr. Duerden, a board-certified physiatrist, offered expert testimony at trial that Dr. Hebron breached the standard of care and that that breach caused the Decedent's death. N.T., 3/27/07, at ·58–59. Therefore, any error by the trial court in admitting Dr. Corboy's testimony was harmless. *See Yacoub v. Lehigh Valley Medical Associates, P.C.,* 805 A.2d 579, 590–91 (Pa.Super.2002). For all of the foregoing reasons, we find Appellants' claim to be without merit.

### Jury Instruction on "Irrelevant Considerations"

¶ 26 Third, Dr. Hebron alone argues that it was reversible error for the trial court to give a supplemental jury instruction taken from the Pennsylvania Suggested Standard Civil Jury Instructions on "irrelevant considerations," claiming that the instruction was both inaccurate and highly misleading to the jury, and may have influenced the verdict in this case. She claims that this was so because there are state and federal laws which require insurance providers to report medical malpractice claims, settlements and judgments to licensing boards and certain other entities.

¶ 27 Our standard of review in this regard is well-settled:

When reviewing a challenge to a jury charge, we must examine the trial court's instruction in its entirety, against the background of all evidence presented, to determine whether error was committed. A jury charge is erroneous if the charge as a whole is inadequate, unclear, or has a tendency to mislead or confuse the jury rather than clarify a material issue. Therefore, a charge will be found adequate unless the issues are not made clear to the jury or the jury was palpably misled by what the trial judge said.

*Buckley v. Exodus Transit & Storage Corp.,* 744 A.2d 298, 305–06 (Pa.Super.1999) (citation omitted).

¶ 28 The trial court stated in its 1925(a) opinion that the "irrelevant considerations" charge was approved by our Supreme Court in *Levine v. Rosen,* 532 Pa. 512, 616 A.2d 623 (1992), and that it "declined the suggestion by [Dr. Hebron] that it join the ranks of courts questioning the charge." Trial Court Opinion, 5/8/08, at 11. We agree, and find no error by the court in issuing the particular instruction.

¶ 29 In *Levine,* our Supreme Court addressed the propriety of the so-

called "irrelevant considerations" jury instruction, which provides as follows:

> A medical malpractice case is a civil action for damages and nothing more. The sole issue is whether the plaintiff has suffered injuries as the result of the defendant's negligence, and is thus entitled to monetary compensation for those injuries. The case does not involve punishment of the defendant, or even criticism of his professional abilities, beyond the facts of this matter. The claim does not involve the defendant's reputation, his medical practice or his rights as a licensed physician. Therefore, no thought should be given to these irrelevant considerations in reaching a verdict in the case.[9]

Pennsylvania Suggested Standard Jury Instruction 10.07 (footnote added). After instructing the jury using the exact language from the proposed instruction, the trial court, upon the defendant's objection, gave a supplemental charge to the jury which took into account the reporting requirements of the Health Care Quality Improvement Act of 1986 ("the Health Care Act"), 42 U.S.C. § 11101, *et seq.*, which requires insurance companies to report any payments made to settle or satisfy a judgment in a medical malpractice action to an information service entitled the National Practitioner Data Bank. This Court reversed, finding that the supplemental charge was erroneous, and that the federal reporting law was entirely irrelevant to the appellant's negligence or liability. On appeal, the defendant asserted that the charge was necessary to accurately instruct the jury about federal health reporting requirements under the Health Care Act.

¶ 30 Our Supreme Court held that the supplemental instruction was erroneous and that the "irrelevant considerations" instruction should have been given without any further elaboration from the trial court. In so holding, the Court stated that the purpose of the instruction was to explain to the jury that it could not consider the effect, if any, that a verdict could have on a defendant's reputation, practice or license—*and that whether such reputation, practice or license was actually affected was irrelevant.* Put another way, the Court held that a medical malpractice case should be decided on its merits regardless of any potential impact of the verdict, including complying with federal reporting requirements.

¶ 31 Subsequently, in *Sedlitsky v. Pareso*, 425 Pa.Super. 327, 625 A.2d 71 (1993), an appellant challenged the same jury instruction, asserting that the Health Care Act rendered the charge factually incorrect and prejudicial. This Court, acknowledging the precedent set in *Levine* that the potential harm to a physician caused by compliance with the Health Care Act was not for the jury in a malpractice case to consider, stated that it "recognize[d] that the [Health Care Act] may cause an unfavorable judgment in a medical malpractice action to negatively impact upon a physician's reputation or practice. Nevertheless, that result is not in conflict with the purpose of the 'irrelevant considerations' instruction and *does not call into question the validity of the instruction.*" *Id.* at 73 (emphasis added).

¶ 32 In light of the well-settled precedent of *Levine* and *Sedlitsky*, we conclude that the trial court in this case did not err in issuing the "irrelevant considerations" charge.

---

9. The trial court issued this jury instruction nearly verbatim in the instant case. *See* N.T.,

3/30/07, at 386–87.

### Use of Learned Treatise

 ¶ 33 Next, Appellants claim that the trial court erred by allowing plaintiff's counsel to elicit alleged hearsay testimony, during the direct examination of Dr. Corboy, from a learned treatise, Lange's Medical Therapeutics ("Lange's").

 ¶ 34 Pennsylvania courts allow the limited use of textual material on direct examination to permit an expert to explain the basis for his reasoning. *See Aldridge v. Edmunds,* 561 Pa. 323, 750 A.2d 292 (2000). In *Aldridge,* defense counsel was permitted to examine an expert witness using two textbook on pediatrics during direct examination over the objections of plaintiff's counsel. On appeal, this Court affirmed the verdict below, finding that such materials could be used to bolster or support the credibility of the expert.

¶ 35 Our Supreme Court reversed, finding that the texts were not used to clarify the basis of the expert witness's opinion, but rather, as a means by which opinion evidence was conveyed to the jury. It pointed out that the texts were enlarged on poster board, that defense counsel guided the witness through a "lengthy series of leading questions further emphasizing the specific contents in a manner unnecessary to the explanation of the expert opinion," and that the materials were offered and admitted into evidence. *Aldridge,* 561 Pa. at 334, 750 A.2d at 298. Accordingly, the Court found the use of the texts to be improper. In so finding, the Court carefully defined the use of learned treatises at trial:

> There is no question that if published material is authoritative and relied upon by experts in the field, although it is hearsay, an expert may rely upon it in forming his opinion; indeed, it would be unreasonable to suppose that an expert's opinion would not in some way depend upon the body of work preceding it.

> *Pennsylvania courts have thus permitted, subject to appropriate restraint by the trial court, limited identification of textual materials (and in some circumstances their contents) on direct examination to permit an expert witness to fairly explain the basis for his reasoning* ... Since, however, the purpose for which treatises may be referenced on direct examination is generally limited to explaining the reasons underlying the opinion, the trial court should exercise careful control over their use to prevent them from being made the focus of the examination. Additionally the trial court should issue appropriate limiting instructions ...

> While we reiterate that, subject to control by the trial court, judicious use of learned treatises may be made on direct examination of an expert witness in appropriate circumstances for the limited purpose of explaining the basis for the opinion, here, the trial court abused its discretion by failing to impose appropriate constraints.

*Id.* at 332–34, 750 A.2d at 297–98 (emphasis added). The Court ultimately indicated, however, that the use of the materials did *not* warrant a new trial, since the points for which they were presented were limited and essentially undisputed, and did not directly bear upon the negligence alleged, and therefore did not prejudice plaintiffs. *Id.* at 335, 750 A.2d at 298–99.

¶ 36 In its 1925(a) opinion, the trial court stated that the portions of Dr. Corboy's direct examination in which he referred to Lange's were "extremely limited" and "certainly not the focus of the examination." Trial Court Opinion, 5/8/08, at 12. It also stated that it permitted Dr. Corboy to refer to the treatise on direct examination to "further explain the basis for his prior opinion testimony that it is important to take precautions when prescribing aspi-

rin and steroids together." *Id.* After review of the testimony in question, we agree.

¶ 37 Towards the end of Dr. Corboy's direct examination, he was asked to identify Lange's as an authoritative text. N.T., 3/23/07, at 277–78. After stating his opinion that aspirin and steroids could together be a gastric irritant and that there were medications which could protect the GI system when administering such drugs in combination, he was asked to read from Lange's for the proposition that when prescribing both aspirin and steroids to a patient, a physician had to "at least think about giving them some kind of medication to protect their stomach." *Id.* at 279–81. There was no further use of the text on direct examination by plaintiff's counsel. Therefore, the text dealt with an extremely limited issue, i.e., the potential risk of gastrointestinal bleeding with the combined use of steroids and aspirin, an issue which, at no point during trial, was contested by Appellants. As the trial court stated, "[t]he substance of those excerpts read into evidence were basic points which were undisputed by Dr. Hebron." N.T., 5/08/08, at 12. Leading questions were not extensively used, nor were the excerpts enlarged for the jury. Given the limited purpose in which Lange's was used on direct examination and the undisputed nature of the medical principle discussed, we conclude that the trial court did not err in this regard.

## *Statements Made During Closing Argument*

¶ 38 Fifth, Appellants allege that it was reversible error for the trial court to refuse to give cautionary instructions following statements made by Hyrcza's counsel during closing argument, which they allege were highly prejudicial and entirely baseless. The statements in question were that doctors "help each other out when they're in a jam," which was a reference to the credibility of one of the defense's expert witnesses, Dr. Sudhir Narla ("Dr.Narla"), and that Dr. Hebron would "let a 60–year–old woman die again." *See* N.T., 3/30/07, at 316, 306.

¶ 39 "Regarding statements during opening and closing arguments, our Supreme Court has held that '[s]o long as no liberties are taken with the evidence, a lawyer is free to draw such inferences as he wishes from the testimony and to present his case in the light most suited to advance his cause and win a verdict in the jury box.'" *Wagner v. Anzon, Inc.*, 453 Pa.Super. 619, 684 A.2d 570, 578 (1996) (citation omitted). "However, this latitude does not include discussion of facts not in evidence which are prejudicial to the opposing party." [10] *Id.* "In general, any prejudicial remarks made by counsel during argument can be handled 'within the broad powers and discretion of the trial judge and his actions will not be disturbed on appeal unless there is an obvious abuse of discretion.'" *Id.*

---

**10.** "It is well established that any statements by counsel, not based on evidence, which tend to influence the jury in resolving issues before them solely by an appeal to passion and prejudice is improper and will not be countenanced." *Young v. Washington Hospital*, 761 A.2d 559, 563 (Pa.Super.2000), *appeal denied*, 566 Pa. 668, 782 A.2d 548 (2001) (citation omitted). In *Young*, defense counsel repeatedly implied during his opening statement that parents brought a lawsuit for their own financial gain rather than the health of their child, stating that they had wanted to consult with an attorney before deciding on surgery for their child. This Court awarded a new trial, stating that these statements were not only "highly prejudicial," but also misleading, since our Rules of Civil Procedure required any jury award to the child to be held in trust until the child reached the age of majority, and therefore, the award would not be readily accessible to the parents.

¶ 40 In its 1925(a) opinion, the trial court stated that it found "evidence to support both statements." Trial Court Opinion, 5/8/08, at 13. Specifically, it stated that the statements in question were based upon testimony elicited from Drs. Narla and Hebron at trial, were responsive to specific arguments made by defense counsel in her closing, and therefore were admissible and proper as part of closing argument. After careful review, we agree.

¶ 41 At trial, defense counsel first introduced the issue of Dr. Narla's potential bias during direct examination, possibly to prevent or minimize the damage of impeachment during cross-examination. Dr. Narla testified that he had been represented by defense counsel in a prior medical malpractice action, was testifying in the instant case after being contacted by another attorney in defense counsel's office, and that defense counsel had taken over the case after that attorney retired. N.T., 3/28/07, at 288–89.

¶ 42 In *voir dire*, plaintiff's counsel explored the connection between defense counsel's representation of Dr. Narla in the other malpractice action and Dr. Narla's retention as an expert by another attorney in defense counsel's firm. *Id.* at 290–92. Dr. Narla testified that he was not accepting payment for his testimony in the instant case, but was requesting that defense counsel donate it to a charity. *Id.* at 295–96. In closing, defense counsel restated that Dr. Narla was donating his fee to charity and was not here "because he was doing me a favor." N.T., 3/30/07, at 260. In his closing, plaintiff's counsel remarked on Dr. Narla's potential bias, stating that "[d]octors in this community help each other out when they're in a jam." *Id.* at 316. Given the underlying context of this statement, we agree with the trial court that this was permissible argument as to Dr. Narla's credibility.

¶ 43 We similarly find the statement concerning Dr. Hebron to be supported by evidence. At trial, Dr. Hebron testified that "if I felt that I needed to do anything different, I would not be sitting in this chair today." N.T., 3/29/07, at 156. She also testified that "I am telling the members of the jury today that I would do everything exactly the same as I did from the date of June 27th through July 6th when I took care of Mrs. Mahunik." *Id.* at 156–57. Defense counsel's statement that Dr. Hebron "would let a 60 year old woman die again" was made in the context of whether in fact Dr. Hebron exercised *good* judgment:

> What [defense counsel] wants to do is let you believe you can't question the judgment of a doctor. The doctors[ ] got to make their best judgment. Well, folks, the word 'judgment' is a two-sided coin. The head of the coin is good judgment, and the tail[ ] of the coin is bad judgment. And doctors sometime make very bad judgments. And I am going to give you a piece of evidence that shows you how bad the judgment can be at times. This woman sits on this stand yesterday, and I asked her one question. 'Doctor, knowing everything that you know now, would you have done it differently?' And do you remember what her answer was? 'No.' She'd let a 60–year–old woman die again instead of saying, 'You know, Mr. Ignelzi, after having seen all of this, and if I had to do it over again, maybe I didn't do it quite right.' But, no. She doesn't have the humility nor the judgment to admit her mistake to you people. And that, folks, is poor and bad judgment.

N.T., 3/30/07, at 305–06. In the context in which the statement was made, we find no error by the trial court in denying Appel-

lants' motion for a cautionary instruction.[11]

### Remittitur of Jury Verdict

¶ 44 Next, Appellants argue that the trial court erred by failing to grant remittitur, pursuant to Rule 1042.72 of our Rules of Civil Procedure, where the jury verdict against them was so excessive as to deviate substantially from reasonable compensation and to shock the conscience.

¶ 45 Under Pa.R.C.P. 1042.72, a trial court must remit an award of damages for non-economic loss in a medical malpractice action which it finds to be excessive. *See* Pa.R.C.P. 1042.72(c). Rule 1042.72(b) provides the following guidelines for what is considered to be an "excessive" amount of damages:

> A damage award is excessive if it deviates substantially from what could be reasonable compensation. In deciding whether the award deviates substantially from what could be considered reasonable compensation, the court shall consider (1) the evidence supporting the plaintiff's claim; (2) factors that should have been taken into account in making the award; and (3) whether the damage award, when assessed against the evidentiary record, strongly suggests that the trier of fact was influenced by passion or prejudice.

Pa.R.C.P. 1042.72(b). The defendant has the burden of convincing the court that the award deviates substantially from what is considered reasonable compensation. Note to Pa.R.C.P. 1042.72(b).

¶ 46 We review a trial court order denying remitittur for an abuse of discretion or an error of law. *Tindall v.*

*Friedman,* 970 A.2d 1159, 1176 (Pa.Super.2009). We will not find a verdict excessive unless it is so grossly excessive as to shock our sense of justice. *Id.* Large verdicts are not necessarily excessive verdicts; each case is unique and dependent on its own special circumstances. *Id.* In awarding damages for past or future non-economic loss, a jury may consider, *inter alia,* the age of the plaintiff, the severity of his or her injuries, whether the injuries are temporary or permanent, the duration and nature of medical treatment, the duration and extent of physical pain and mental anguish on the part of the plaintiff, and the plaintiff's physical condition before the injuries. *See* Pa.R.C.P. 223.3.

¶ 47 In its 1925(a) opinion, the trial court stated that Appellants failed to meet their burden of proving that the jury verdict in this case was excessive. Trial Court Opinion, 5/8/08, at 14. It further stated that Appellants did not contend that the evidence failed to support the plaintiff's claim or that improper factors were taken into consideration, or identify what passion or prejudice influenced the jury. *Id.* The trial court stated that instead, they merely pointed to other cases where jury awards were "substantially less under facts which they believe [were] more compelling and argue[d] that the only reasonable explanation is that this award [was] so grossly exorbitant that it must have been based on passion or prejudice." *Id.*

¶ 48 The trial court found that significant evidence supported the jury award of $7,213,200 ($5,383,200 of which was allocated for the wrongful death claim and $1,830,000 for the survival claim):[12]

---

11. At trial, the trial court also stated that it was afraid that issuing a cautionary statement would draw more attention to the statements in question. N.T., 3/30/07, at 329–30.

12. At the close of trial, the trial court instructed the jury that as part of the damages recoverable under the Wrongful Death Act, it was entitled to award damages compensating the Decedent's family for the loss of contributions, society, comfort and services they

While admittedly a large verdict, there was significant testimony regarding the loss suffered by Decedent's family. Defense counsel conceded in opening statement and in closing that this was a very tragic case. Decedent was 60 years old with a 24 year life expectancy. She left behind 7 children and numerous grandchildren. Three of her children testified to the enormous contribution Decedent made to them and to their families. Decedent had been living with daughters [Hyrcza] and Catherine Mahunik [ ("Mahunik") ] since 1994. Both offered extensive testimony regarding the position their mother held in the family and in their lives. [Hyrcza] has 7 children and her husband travels constantly. She relied on Decedent for assistance in raising and caring for her children. [Hyrcza] testified to the closeness of their relationship and recounted the emotional support her mother provided to her when her own 4 year old son died. [Mahunik] testified to the love and emotional support provided to her by her mother all the years they were living together. Decedent had an extremely close relationship with her children and grandchildren, providing a constant source of love, guidance, tutelage and moral upbringing. While there was no evidence of any actual monetary contribution, there was significant and compelling testimony regarding Decedent's contribution to her large family in the form of services, society and comfort.

There was testimony from expert witnesses and family members about the suffering Decedent endured while she lay dying at [Suburban General] in the last weeks of June and the first week of July. Her daughters described her as being 'in a panic,' 'getting out of control, like moving around like really needing help' and 'struggling.' She was thrashing around unable to breathe. After suffering cardiac arrest, she was intubated and strapped in a bed with her head slanted down to raise her blood pressure. She looked scared and mouthed the words, 'I love you' to them. She was awake, conscious, agitated, anxious and she indicated to her daughters that she was in pain. She suffered a second cardiac arrest on July 10. The doctors told her children that there was fluid seeping out of her eyes because it had nowhere to go. Having sat through the testimony and watched the witnesses describe the ordeal their mother went through, the loss to this large and close family, the court was not persuaded that the damage award was excessive.

*Id.* at 15–16 (citations omitted).

¶ 49 After having reviewed the record in light of the trial court's findings, we find no abuse of discretion or error of law committed by the trial court. Dr. Corboy testified that the Decedent, who was 60 years old at the time of her death and whose only significant underlying medical condition was multiple sclerosis, had a life expectancy of at least 24 more years. N.T., 3/23/07, at 274. At trial, three of the Decedent's children described their close relationship with their mother, as well as her dedication to and support of her family, which included working in her husband's bakery/coffee shop before and after

---

would have received from their mother. It was also told it could consider the value of the Decedent's services, including guidance, tutelage and moral upbringing that her seven children would have received had she not died. As for damages recoverable under the Survival Act, the court instructed the jury that it was permitted to award, *inter alia,* damages that "fairly and adequately" compensated for the Decedent's mental and physical pain, and suffering and inconvenience that she endured. N.T., 3/30/07, at 359–60. Appellants objected to neither of these charges.

his death, raising her seven children, and providing emotional support and assistance with raising her grandchildren. N.T., 3/26/07, at 12–45, 200–231; N.T., 3/27/07, at 7–33, 136–152. They testified to the significant pain their mother underwent between July 8th and 10th, 2001, including having panic attacks and having liquid seeping out of her eyes at one point because there was "nowhere else for it to go." N.T., 3/26/07, at 43; N.T., 3/27/07, at 150–51.

¶ 50 Dr. Corboy also testified that the Decedent suffered significant pain and suffering between July 8th, when she suffered cardiac arrest and was placed on a ventilator, and July 10th, the date of her death, and that she was "clearly conscious" throughout the ordeal, as evidenced by her thrashing and signs of discomfort. N.T., 3/23/07, at 274–76. He testified that a sedative was administered to the Decedent to alleviate her consciousness of her pain. *Id.* at 275. Dr. Duerden also testified that the Decedent experienced conscious pain and suffering between July 8th and 10th. N.T., 3/27/07, at 59. Defense counsel did not contest any aforementioned evidence of damages.

¶ 51 Moreover, we find Appellants' comparison of the verdict in their case to those in other cases unpersuasive.[13] Our Rules of Civil Procedure do not indicate a monetary amount that is considered "reasonable," and a determination of what constitutes an excessive verdict cannot be reduced to a simple comparison or calculus as Appellants suggest. The trial court conducted a thorough analysis of the factors set forth in Pa.R.C.P. 223.3, consider-

ing the Decedent's age and projected life expectancy, the severity of her pain and suffering and its duration, the nature of the medical treatment, her physical condition before the injuries, as well as significant non-tangible factors such as the Decedent's close relationship with her family and the emotional support and assistance she provided them, to conclude that the jury award did not "shock the conscience." We find that the jury could have reasonably awarded the amount in question and conclude that the trial court's determination was not in error.

### Jury Charge on Corporate Negligence

 ¶ 52 Finally, ChoiceCare alone argues that the trial court committed reversible error by charging the jury on its alleged corporate negligence, which permitted the jury to find ChoiceCare directly liable for the care rendered to the Decedent. ChoiceCare claims that corporate liability does not extend to medical professional corporations and that it was adequately covered by a standard agency charge.

 ¶ 53 "In reviewing a claim regarding error with respect to a specific jury charge, we must view the charge in its entirety taking into consideration all the evidence of record and determine whether or not error was committed and, if so, whether that error was prejudicial to the complaining party." *Carpinet v. Mitchell,* 853 A.2d 366, 371 (Pa.Super.2004) (citation omitted).

¶ 54 The theory of corporate negligence as a basis for hospital liability was first

13. Dr. Hebron cites to *Smith,* 885 A.2d 1012; *Goldberg ex rel. Goldberg v. Isdaner,* 780 A.2d 654 (Pa.Super.2001), *appeal denied,* 573 Pa. 667, 820 A.2d 705 (2003); *Gunn v. Grossman,* 748 A.2d 1235 (Pa.Super.2000), *appeal denied,* 564 Pa. 711, 764 A.2d 1070 (2000), in which juries awarded verdicts of one, six and

two million dollars, respectively. ChoiceCare cites to *Vogelsberger v. Magee–Womens Hospital,* 903 A.2d 540 (Pa.Super.2006), in which jury verdicts of $250,000 against a gynecologist and $350,000 against a hospital were reduced to $125,000 and $75,000, respectively, and affirmed by this Court on appeal.

recognized by our Supreme Court in *Thompson v. Nason Hospital,* 527 Pa. 330, 591 A.2d 703 (1991). In *Thompson,* the Court found that a hospital could owe a non-delegable duty to uphold a certain standard of care directly to its patients, without requiring an injured party to establish the negligence of a third party. The basis for imposing direct liability on hospitals, as recognized by the Court, was that hospitals had "evolved into highly sophisticated corporations operating primarily on a fee-for-service basis. The corporate hospital of today has assumed the role of a comprehensive health center with responsibility for arranging and coordinating the total health care of its patients." *Id.* at 337–38, 591 A.2d at 706.

¶ 55 In *Thompson,* the Court held that a hospital owes the following duties to its patients: (a) to use reasonable care in the maintenance of safe and adequate facilities and equipment; (b) to select and retain only competent physicians; (c) to oversee all persons who practice medicine within its walls as to patient care; and (d) to formulate, adopt and enforce adequate rules and policies to ensure quality care for its patients. *Id.* at 339–40, 591 A.2d at 707. The Court held that in order for a hospital to be charged with negligence, it was necessary to show that it had "actual or constructive knowledge of the defect or procedures which created the harm" and that the hospital's negligence was "a substantial factor in bringing about the harm to the injured party." *Id.* at 341, 591 A.2d at 708 (citations omitted).

¶ 56 The doctrine of corporate liability was extended to HMO's in *Shannon v. McNulty,* 718 A.2d 828 (Pa.Super.1998), in which this Court likened those entities to hospitals by stating that "while these providers do not practice medicine, they do involve themselves daily in decisions affecting their subscriber's medical care."

*Id.* at 835. "These decisions may, among others, limit the length of hospital stays, restrict the use of specialists, prohibit or limit post hospital care, restrict access to therapy, or prevent rendering of emergency room care." *Id.* We stated that these decisions "must pass the test of medical reasonableness," and that to "hold otherwise would be to deny the true effect of the provider's actions, namely, dictating and directing the subscriber's medical care." *Id.*

¶ 57 This Court declined, however, to extend the doctrine to apply to a physician's office in *Sutherland v. Monongahela Valley Hosp.,* 856 A.2d 55 (Pa.Super.2004), finding that the rationale in *Thompson* of a hospital assuming the role of a "comprehensive health center with responsibility for arranging and coordinating the total health care of its patients" did not apply. The issue in this case is therefore whether ChoiceCare's involvement in the Decedent's medical decisions was closer to that of a physician's office or to that of a hospital or an HMO. The trial court found that it was the latter. We agree.

¶ 58 In its 1925(a) opinion, the trial court stated that ChoiceCare had total responsibility for the coordination of care within Suburban General's rehabilitation unit, and had utterly failed in upholding its duties to the Decedent as a patient in that unit:

[ChoiceCare] is a professional corporation comprised of doctors with many specialties including internal medicine, family medicine and occupational medicine. [Suburban General] contracted with ChoiceCare to provide medical care to patients admitted into the Rehabilitation Unit. The Rehabilitation Unit is administratively separate from the other units at [Suburban General]. ChoiceCare oversaw and ran the Rehabilitation Unit at [Suburban General], assuming responsibility for the coordination and

management of all patients. A patient admitted to the Rehabilitation Unit was assigned to a ChoiceCare physician who served as that patient's attending physician and who saw and coordinated the patient's care. ChoiceCare physicians establish a rehab program setting forth the various physical therapy regimens. They impanel a team of therapists to carry out the special therapies, and retain a nutritionist to participate in the patient's care. It is their responsibility to make sure that the other physicians are consulted and become involved in medical treatment as needed. Choice-Care arranged and coordinated the total health care for its patients in the Rehabilitation Unit. ChoiceCare was responsible for all of the medical care of patients in the Rehab Unit. There was testimony from physicians affiliated with ChoiceCare that the corporation had all the duties of a hospital under [*Thompson*] except the duty to use reasonable care in the maintenance of safe and adequate facilities and equipment.

Dr. Hebron provided ChoiceCare with three months notice prior to terminating her employment. It was the policy of ChoiceCare that its physicians saw patients each day during the week and one day on weekends. After Dr. Hebron left, ChoiceCare did not assign another physician to attend to Decedent. It did not arrange for another physician to check on her after July 5th, literally leaving her in the Rehabilitation Unit bleeding to death. Based on the evidence presented, the standard agency charge was insufficient to address the evidence of negligence on the part of ChoiceCare after Dr. Hebron had terminated her employment. In light of the role which ChoiceCare played in this case, the court determined that a modi-fied charge on corporate negligence was appropriate.

Trial Court Opinion, 5/8/08, at 17–18 (citations omitted).

¶ 59 The record on appeal supports these findings, establishing that Choice-Care was a comprehensive health care provider with the "responsibility for arranging and coordinating the total health care of its patients," and was involved in daily decisions affecting its patients' medical care. *See Thompson*, 527 Pa. at 337–38, 591 A.2d at 706; *Shannon*, 718 A.2d at 835. At trial, Dr. Greim, an employee of ChoiceCare, testified that ChoiceCare was a professional medical corporation formed around 1997–98 and comprised of physiatrists, internists, family practitioners and occupational medicine practitioners. N.T., 3/22/07, at 116–18. He testified that the rehabilitation unit at Suburban General was "administratively separate" from the rest of the hospital, and that ChoiceCare was responsible for such unit. *Id.* at 119–20, 122. Dr. Franz, president and Chief Operating Officer of ChoiceCare, described a number of procedures in place that demonstrated that ChoiceCare was administratively responsible for the rehabilitation unit, e.g., hiring physicians, reviewing and implementing policies, and holding its own officer and shareholder meetings. *Id.* at 332.

¶ 60 Moreover, the record supports the trial court's finding that ChoiceCare failed to provide adequate, let alone comprehensive, care for its patients. There was a complete lack of evidence presented at trial to substantiate a claim that ChoiceCare assigned any of its physicians to monitor or provide the Decedent with medical care between July 6th, 2001, when Dr. Hebron ceased her employment with ChoiceCare, and July 8th, 2001, when the Decedent suffered cardiac arrest and was moved to

the intensive care unit.[14]

¶ 61 After reviewing the evidence, we find that it sufficiently establishes that 1) ChoiceCare was responsible for the coordination and management of all patients in the rehabilitation unit at Suburban General, which it independently operated, and 2) ChoiceCare failed to deliver the comprehensive care it was contractually obligated to provide the Decedent. Accordingly, we agree with the trial court that a standard negligence charge would have been inadequate under the circumstances for the foregoing reasons, and decline to overturn its determination.

¶ 62 Judgment affirmed. Application for post-submission communication denied.[15]

**14.** It was established at trial that ChoiceCare had no records in its possession to prove that a ChoiceCare physician had seen the Decedent on July 6th, 2001 after Dr. Hebron's departure, or on July 7th and 8th, 2001. N.T., 3/22/07, at 139; N.T., 3/23/07, at 299, 336, 359–60; N.T., 3/26/07, at 107–08. Doctors Greim and Franz were unable to identify who, if anyone, ChoiceCare assigned to cover the rehabilitation unit during this time. N.T., 3/22/07, at 143. Dr. Hebron herself testified that the medical records did not reflect that there was a plan in place to ensure that the Decedent would be seen by a ChoiceCare doctor upon her departure. N.T., 3/26/07, at 109–10.

**15.** On August 22, 2008, Hyrcza filed an application for post-submission communication attaching Pennsylvania Standard Civil Jury Instruction 1.13 and Subcommittee Note, pertaining to settling defendants, and citing Pa.R.A.P. 2501(b), which provides a procedure for informing this Court of a change in the status of the law *after appellate briefs are filed.* See Pa.R.A.P. 2501(b); *Com., Dept. of Transp., Bureau of Motor Vehicles v. Kosak,* 162 Pa.Cmwlth. 505, 639 A.2d 1252, 1255 (1994). We deny Hyrcza's request as this particular jury instruction: (a) was neither discussed nor mentioned in Hyrcza's appellate brief or at trial, (b) was last revised in March 2008, three months before briefs were submitted in this case, and (c) is wholly inapplicable as it indicates that it is inappropriate where settlement occurred prior to trial, which is the case instantly.