J-A14023-14

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| LINDA JUDGE AND DAVID JUDGE, ADMINISTRATORS OF THE ESTATE OF ASHLEY JUDGE, DECEASED, LINDA JUDGE, IN HER OWN RIGHT | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellants | |
| v. | |
| WYOMING VALLEY HEALTH CARE SYSTEM, INC.; WILKES-BARRE GENERAL HOSPITAL; CYNTHIA LISKOV, M.D. AND SAPPHIRE EMERGENCY SERVICES, P.C. | |
| Appellees | No. 1274 MDA 2013 |

Appeal from the Judgments Entered
December 15, 2011 and September 3, 2013
In the Court of Common Pleas of Luzerne County
Civil Division at No(s): 2007-00469, 2007-01810, 2007-01902

BEFORE:  FORD ELLIOTT, P.J.E., OLSON and STRASSBURGER,* JJ.

MEMORANDUM BY OLSON, J.:                          **FILED MAY 18, 2015**

Appellants, Linda Judge and David Judge, Administrators of the Estate of Ashley Judge, deceased, and Linda Judge, in her own right, appeal from the judgments entered on December 15, 2011 and September 3, 2013. After careful consideration, we affirm.

The factual background of this case is as follows.  On February 24, 2005, 15-year-old Ashley Judge ("Ashley") fell down 12 steps at her house. Hanover Township Community Ambulance Association Inc. (the "Ambulance Association") dispatched an ambulance to the residence at 10:34 p.m.  The

* Retired Senior Judge assigned to the Superior Court.

ambulance was staffed by paramedic Keith Feschuk ("Feschuk") and emergency medical technician Kareena Picton ("Picton"). The ambulance arrived at Ashley's residence at 10:43 p.m. Ashley was placed in the back of the ambulance and her mother, Linda Judge, sat up front in the passenger seat. A snowstorm was hitting the area at the time which made vehicular travel difficult.

Ashley informed Feschuk that 20 to 30 minutes earlier she had become lightheaded while walking up the stairs and subsequently fell down the 12 stairs. Ashley did not lose consciousness during the incident and remembered the entire episode. Ashely complained of pain in her lower chest and upper abdomen and some nausea. Ashley's blood sugar level was 475 mg/dL both before and after being given saline.[1] At 11:07 p.m., Ashley was immobilized and transferred to the ambulance. Feschuk and Picton planned to transport Ashley to Wilkes-Barre General Hospital (the "Hospital"). At 11:19 p.m., Feschuk called the Hospital for medical direction. This call was answered by paramedic Ronald Redmond ("Redmond"). Dr. Cynthia Liskov ("Liskov"), the medical command physician, listened to this telephone call. Liskov was employed by Sapphire Emergency Services, P.C. ("Sapphire"), which contracted with the Hospital to provide emergency department physicians.

---

[1] Normal blood sugar for a patient such as Ashley is approximately 100 mg/dL. **See** N.T., 6/11/13, at 57.

Feschuk relayed to Redmond that Ashley did not have a diabetic history and that it was not necessary to transport Ashley to a trauma center. At 11:30 p.m., Feschuk again contacted the Hospital medical command and advised that Ashley's right pupil had become dilated and less responsive to light. A nurse at the Hospital told Feschuk to divert to Community Medical Center ("CMC"), the nearest trauma center. On the way to CMC, Picton became lost and stopped to ask for directions to CMC. At 11:40 p.m., Ashley's breathing became labored and she began drifting out of consciousness. Around 11:45 p.m., Ashley was provided with oxygen and administered atropine[2] and epinephrine.[3] At 12:05 a.m. on February 25, 2005, the ambulance arrived at CMC. Seven minutes later, Dr. Andrew Furman ("Furman") pronounced Ashley dead.

The procedural history of this case is as follows. On January 12, 2007, Appellants filed a complaint against the Ambulance Association, Feschuk, Picton, Wyoming Valley Healthcare System,[4] the Hospital, CMC, Community

---

[2] "[A]tropine is a drug given in the hospital as kind of a resuscitative type drug. It's supposed to increase the heart rate to try to establish blood pressure and blood flow." **Castellano v. Texas**, 2013 WL 1258161, *3 n.1 (Tex. App. Mar. 19, 2013) (internal quotation marks omitted).

[3] "[E]pinephrine is the first drug administered when a child is dying." **Overton v. Texas**, 2009 WL 3489844, *7 n.21 (Tex. App. Oct. 29, 2009).

[4] Appellants filed their three lawsuits just prior to the expiration of the statute of limitations. In an abundance of caution, they included a plethora of redundant corporate entities as defendants. This was one such defendant.

Medical Center Healthcare System,[5] and Furman. That case was docketed at 2007-00469 ("the 469 action").

On February 21, 2007, Appellants commenced an action against Liskov, Sapphire, and Emergency Services, P.C.[6] by filing a praecipe for a writ of summons. That case was docketed at 2007-01810 ("the 1810 action"). On June 4, 2007, Appellants filed a complaint in the 1810 action.

On February 23, 2007, Appellants commenced an action against Hanover Community Ambulance Association,[7] Wyoming Valley Health Care System,[8] Wyoming Valley Healthcare System, Inc. ("WVHCS") (the parent company of the Hospital), and WVHCS-Hospital[9] by filing a praecipe for a writ of summons. That case was docketed at 2007-01902 ("the 1902 action"). On May 14, 2007, Appellants filed a complaint in the 1902 action.

On May 14, 2008, Appellants discontinued their action against Hanover Community Ambulance Association in the 1902 action. *See* Pa.R.C.P. 229(a)(2). On February 17, 2010, summary judgment was granted in favor of Emergency Services, P.C. in the 1810 action, and CMC, Community Medical Center Healthcare System, and Furman in the 469 action. On June

---

[5] ***See*** note 4, ***supra***.

[6] ***See*** note 4, ***supra***.

[7] ***See*** note 4, ***supra***.

[8] ***See*** note 4, ***supra***.

[9] ***See*** note 4, ***supra***.

30, 2010, Appellants filed a motion in the 469 action seeking that all three actions

> be consolidated to permit discovery deadlines to be entered and to ensure that there is only one trial with regard to liability and damages so as to avoid issues of *res judicata*, collateral estoppel[,] and possible inconsistent jury verdicts.

Brief in Support of Motion for Consolidation, 6/30/10, at 3. On August 24, 2010, the trial court granted Appellants' motion. The trial court consolidated all three actions under the 469 action. On December 15, 2011, the trial court granted summary judgment in favor of Picton, the Hospital, and Wyoming Valley Healthcare System in the 469 action and WVHCS-Hospital, Wyoming Valley Health Care System, and WVHCS in the 1902 action.[10] **See generally Judge v. Hanover Twp. Cmty. Ambulance Ass'n, Inc.**, 2011 WL 12526056 (C.C.P. Luzerne Dec. 15, 2011).

On January 15, 2012, Appellants filed a motion to reconsider the trial court's December 15, 2011 order granting summary judgment. In the alternative, Appellants sought certification under Pennsylvania Rule of Appellate Procedure 341(c).[11] The trial court denied the motion for

---

[10] The trial court also granted partial summary judgment to the four remaining defendants: the Ambulance Association and Feschuk (defendants in the 469 action) and Liskov and Sapphire (defendants in the 1810 action).

[11] Rule 341(c) allows a trial court to certify as final an order disposing of certain claims and/or certain parties which would otherwise be deemed interlocutory under the rules of appellate procedure and interpretive case law.

reconsideration on February 28, 2012. On March 15, 2012, Appellants filed a petition for permission to appeal the December 15, 2011, summary judgment order. On April 11, 2012, this Court denied the petition as untimely. *See Judge v. Hanover Twp. Cmty. Ambulance Ass'n, Inc.*, 23 MDM 2012 (Pa. Super. Apr. 11, 2012) (*per curiam*).

Trial commenced on June 10, 2013 against the two remaining defendants in the 1810 action, Liskov and Sapphire. On June 17, 2013, the jury found in favor of Liskov and Sapphire. Also on June 17, 2013, the Ambulance Association and Feschuk settled with Appellants.[12] No judgment was ever entered in the Ambulance Association or Feschuk's favor and no discontinuance was filed with respect to those two defendants. Instead, on August 23, 2013, the Ambulance Association and Feschuk filed a supplemental new matter that raised the June 17, 2013 settlement as an affirmative defense.

Appellants filed a timely post-trial motion.[13] While the post-trial motion remained pending, Appellants filed a notice of appeal on July 12,

---

[12] Picton was also a party to the settlement, despite the fact that summary judgment had previously been entered in her favor.

[13] Although the trial was only against defendants in the 1810 action, almost all documents relating thereto, including the post-trial motion, were filed in the 469 action.

2013.[14] The notice of appeal contained the captions for all three cases and read, "Notice is hereby given that [Appellants] hereby appeal[] to the Superior Court of Pennsylvania from the [j]udgment entered in the above consolidated matter on the 14th day of December 2011."[15] Notice of Appeal, 7/12/13, at 2. The notice of appeal was docketed in the 1902 action and later transferred to the 469 action by the trial court prothonotary.[16] The trial court denied Appellants' post-trial motion on August 13, 2013.[17] On August

---

[14] The notice was dated July 12, 2012. The date stamp from the prothonotary, however, indicates that the notice of appeal was filed on July 12, 2013.

[15] The December 15, 2011 summary judgment order was dated December 14, 2011; however, it was filed on December 15, 2011.

[16] The certified record is unclear as to whether the notice of appeal was filed in the 1902 action and transferred to the 469 action or vice versa. This issue, however, does not impact our conclusion regarding our jurisdiction over this matter. Therefore, we decline to address it further.

[17] On August 21, 2013, Appellants filed an application with this Court requesting that the notice of appeal be amended to note that it was being taken from the August 13, 2013 order denying their post-trial motion. On September 6, 2013, this Court denied the application as moot and directed the prothonotary to update the docket to reflect that the July 12, 2013 notice of appeal was being taken from the "August 13, 2013 order." Order Denying Application for Relief, 9/6/13. This order was legally flawed in that the August 13, 2013 order was not a final appealable order. **See Maya v. Johnson & Johnson**, 97 A.3d 1203, 1208 n.2 (Pa. Super. 2014) (citation omitted) ("An appeal to this Court can only lie from judgments entered subsequent to the trial court's disposition of post-verdict motions, not from the order denying post-trial motions."). This error was a breakdown in the judicial system. We therefore shall treat Appellants' July 12, 2013 notice of appeal as having been taken from the judgment entered in the 1810 action (ironically entered on the 469 docket), as well as the dispositions entered in the 469 and 1902 actions.

22, 2013, this Court ordered Appellants to have the trial court enter judgment in favor of Liskov and Sapphire. The trial court entered judgment on September 3, 2013.[18]

Appellants present six issues for our review:

1. [Did the trial court err by granting summary judgment in favor of the Hospital?

2. Did the trial court err by granting summary judgment with respect to Linda Judge's claim for negligent infliction of emotional distress ("NIED")?

3. Did the trial court err by failing to preclude testimony about mononucleosis?

4. Did the trial court err by permitting Feschuk to appear on the verdict slip?

5. Did the trial court err by failing to grant a new trial because of alleged jury irregularities?

6. Did the trial court err by granting summary judgment with respect to Appellants' claim for punitive damages?]

Appellants' Brief at 4.[19]

"A threshold question is whether this Court has jurisdiction to decide the appeal." *Commonwealth v. Wright*, 78 A.3d 1070, 1077 (Pa. 2013). Although the parties have only raised certain questions regarding our jurisdiction, we may raise subject matter jurisdiction concerns *sua sponte*. *See Sheard v. J.J. DeLuca Co.*, 92 A.3d 68, 75 (Pa. Super. 2014) (citation

---

[18] The trial court did not order Appellants to file a concise statement of errors complained of on appeal. *See* Pa.R.A.P. 1925(b).

[19] The issues have been re-numbered for ease of disposition.

- 8 -

omitted). Thus, we first concentrate our attention on whether we possess jurisdiction over this appeal. ***See Coulter v. Ramsden***, 94 A.3d 1080, 1084 (Pa. Super. 2014), *appeal denied*, 403 WAL 2014 (Pa. Dec. Dec. 10, 2014) (citation omitted). As a pure question of law, our standard of review in determining whether we possess jurisdiction is *de novo* and our scope of review is plenary. ***See Beneficial Consumer Disc. Co. v. Vukman***, 77 A.3d 547, 550 (Pa. 2013) (citation omitted).

In general, a party invokes appellate jurisdiction by filing a notice of appeal within 30 days of a judgment, decision, decree, sentence or adjudication that disposes of all claims and all parties. ***See*** Pa.R.A.P. 903(a) (a "notice of appeal . . . shall be filed within 30 days after the entry of the order from which appeal is taken"); Pa.R.A.P. 102 (defining the term "order" for purposes of the appellate rules to include a judgment, decision, decree, sentence or adjudication); Pa.R.A.P. 341(a) and (b)(1) (providing that appeals as of right may be taken from "final orders" and defining that term). Appellants here rely upon a notice of appeal that they filed on July 12, 2013. As we stated in our recitation of the facts, Appellants initially filed their notice in the 1902 action and the prothonotary later filed a copy in the 469 action. Moreover, as we stated in footnote 17, we shall treat Appellants' notice as having been filed in the 1810 action, given their August 21, 2013 application for relief and the erroneous order that issued in response to that request.

To determine whether Appellants' notice timely invoked appellate jurisdiction over the orders entered separately at docket numbers 469, 1810, and 1902, we look initially to the Pennsylvania Rules of Appellate Procedure. In relevant part, the note to Pennsylvania Rule of Appellate Procedure 341 provides:

> A party needs to file only a single notice of appeal to secure review of prior non-final orders that are made final by the entry of a final order, **see K.H. v. J.R.**, 826 A.2d 863, 870-871 (Pa. 2003) (following trial); **Betz v. Pneumo Abex LLC**, 44 A.3d 27, 54 (Pa. 2012) (summary judgment). **Where, however, one or more orders resolves issues arising on more than one docket or relating to more than one judgment, separate notices of appeal *must* be filed. Commonwealth v. C.M.K.**, 932 A.2d 111, 113 & n.3 (Pa. Super. 2007) (quashing appeal taken by single notice of appeal from order on remand for consideration under Pa.R.Crim.P. 607 of two persons' judgments of sentence).

Pa.R.A.P. 341 note (emphasis added).

Based upon Pennsylvania Rule of Appellate Procedure 341, we deduce that, because separate notices were required at each docket number, the timeliness of each notice must be established with reference to the order from which an appeal has been taken. In this case, when we compare the filing date of Appellants' July 12, 2013 notice of appeal to the entry dates of the orders that terminated litigation between the parties, we conclude that Appellants timely appealed from the 469 and 1810 actions. As discussed *infra*, the litigation at case number 469 concluded on August 23, 2013 when Feschuk and the Ambulance Association filed a supplemental new matter raising their settlement agreement with Appellants as an affirmative

defense.[20]  The litigation at case number 1810 ended when the trial court entered judgment on September 3, 2013, following the jury's defense verdict and the ensuing denial of post-trial motions.  As to these actions, under Pennsylvania Rule of Appellate Procedure 905(5), Appellants' July 12, 2013 notice is deemed timely filed from the order that ended litigation in the 469 action and as to the final order in the 1810 action.  *See* Pa.R.A.P. 905(5) ("A notice of appeal filed after the announcement of a determination but before the entry of an appealable order shall be treated as filed after such entry and on the day thereof.").[21]  In the 1902 action, however, Appellants' notice appears manifestly untimely.  The litigation at case number 1902 concluded when the trial court entered summary judgment in favor of the defendants on December 15, 2011, 575 days before Appellants filed their notice of appeal.  Hence, Appellants' notice in the 1902 action was filed outside the 30-day appeal period.

This approach to determining whether Appellants properly established appellate jurisdiction – which compares the filing date of Appellants' notice with the date of entry for each final order that terminated the cases at bar –

---

[20] Recall that one of the defendants in the 469 action, Picton, was included in the settlement agreement despite the prior entry of summary judgment in her favor.

[21] Liskov and Sapphire argue in their letter brief that the notice of appeal in this case was filed prematurely.  Rule 905, however, addresses this issue.

derives support not only from Pennsylvania Rule of Appellate Procedure 341 but also our prior decision in **C.M.K**.

In **C.M.K.**, a jury convicted C.M.K. and M.W.K. of multiple counts of endangering the welfare of a child and simple assault.[22]  Both defendants filed notices of appeal from their respective judgments of sentence.  This Court consolidated their direct appeals and, ultimately, vacated the judgments of sentence and remanded for consideration of a Pennsylvania Rule of Criminal Procedure 607 motion challenging the weight of the evidence.  After a hearing, the trial court denied that motion and imposed separate sentences upon the defendants in separate orders entered on separate dockets.  Thereafter, the **C.M.K.** defendants filed a single notice of appeal from their judgments of sentence.

This Court quashed the appeal in **C.M.K.**, noting that Pennsylvania courts disapproved of the practice of submitting a single appeal from multiple orders.[23]  **C.M.K.**, 932 A.2d at 112.  We reasoned that, while some

---

[22] The charges against the defendants in **C.M.K.** were filed and prosecuted at separate docket numbers but the cases were consolidated for trial.

[23] Under the circumstances of this case, we do not believe that quashal serves as an appropriate remedy.  In **C.M.K.**, we quashed the appeal because the appellants filed a single notice of appeal purporting to challenge two judgments of sentence.  We found this practice to be repugnant to the appellate rules.  Here, however, we are treating Appellants' notice of appeal as having been filed at all three docket numbers.  Hence, our primary reason for discussing **C.M.K.** and Pennsylvania Rule of Appellate Procedure 341 is the idea that multiple final orders entered on multiple dockets call for separate notices of appeal where appellate review is sought.

appellate issues might coincide, many appellate claims would not overlap. In **C.M.K.**, the defendants proceeded to a consolidated trial, but were convicted individually of different charges and sentenced individually (at their respective docket numbers on separate dates) to different punishments. Therefore, this Court concluded that the defendants should have filed separate notices of appeal from each of the judgments of sentence entered at the defendants' individual docket numbers. **Id**. at 112-113.

**C.M.K.** illustrates application of the principle set forth in Pennsylvania Rule of Appellate Procedure 341, *i.e.* that separate notices of appeal **must** be filed when litigants seek to challenge final orders arising on more than one docket or relating to more than one judgment.[24] We infer from this sensible precept that the timeliness of each such notice should be judged by comparing its filing date against the entry date of the challenged order. While we readily acknowledge that **C.M.K.** was a criminal matter and that the present case involves a civil appeal, we see several points of alignment between the cases that support our approach to determining whether

---

[24] We note that this Court's decision in **C.M.K.** conflicts with the Commonwealth Court's decision in **Alma v. Monroe Cnty. Bd. of Assessment Appeals**, 83 A.3d 1121 (Pa. Cmwlth. 2014). In **Alma**, the Commonwealth Court held that failure to file notices of appeal at each case was a procedural defect and not a jurisdictional defect.

jurisdiction is proper.[25]  Like **C.M.K.**, in which the Commonwealth charged

the defendants at two distinct dockets and proceeded to a consolidated joint

---

[25] This is not a case in which one or more interlocutory orders entered on a single docket are challenged on appeal following the entry of an appealable order or judgment on the same docket number.  **See e.g. Stephens v. Messick**, 799 A.2d 793, 798 (Pa. Super. 2002) ("As a general rule, interlocutory orders that are not subject to immediate appeal as of right may be reviewed on a subsequent timely appeal of the final appealable order or judgment in the case.").  Moreover, this case does not present a joint appeal under Pennsylvania Rule of Appellate Procedure 512.  Rule 512 states:

> Parties interested jointly, severally or otherwise in any order in the same matter or in joint matters or in matters consolidated for the purposes of trial or argument, may join as appellants or be joined as appellees in a single appeal where the grounds for appeal are similar, or any one or more of them may appeal separately or any two or more may join in an appeal.

> Note: This describes who may join in a single notice of appeal. The rule does not address whether a single notice of appeal is adequate under the circumstances presented. **Under Rule 341, a single notice of appeal will not be adequate to take an appeal from orders entered on more than one trial court docket. See** Rule 341, Note ("Where, however, one or more orders resolves issues arising on more than one docket or relating to more than one judgment, separate notices of appeal must be filed.").

Pa.R.A.P. 512 (with notation; emphasis added).

Appellants' challenge to separate orders entered on three distinct dockets does not fall within the purview of Rule 512.  **See General Elec. Credit Corp. v. Aetna Cas. and Surety Co.**, 263 A.2d 448, 452-453 (Pa. 1970) (construing virtually identical Rule 20(A) of the former Rules of the Supreme Court of Pennsylvania and noting that reference to a singular 'order' in the phrase "in any order" does not displace the rule that "a single appeal is incapable of bringing on for review more than one final order, judgment or decree"); **Egenrieder v. Ohio Casualty Group**, 581 A.2d 937, 940 n.3 (Pa. Super. 1990) (Rule 512 did not apply and separate appeals were required where trial court denied petitioner-appellants' motions to intervene by way
*(Footnote Continued Next Page)*

trial, Appellants here filed three separate cases and subsequently secured consolidation solely to obtain uniform discovery deadlines and to avoid multiple trials on liability and damages.[26]   Moreover, like **C.M.K.** in which separate judgments of sentence were imposed, the final orders terminating litigation between the parties in the instant cases were entered at different docket numbers on different dates and for different reasons.   Lastly, our review of the claims raised before us, by docket number, also reveals substantial differences among the cases in terms of the issues Appellants seek to litigate on appeal.[27]   Appellants' first, second, and sixth claims (**see supra** at 8) involve defendants sued in the 469 action.   Appellants' second, third, fourth, fifth, and sixth claims involve defendants sued in the 1810

_(Footnote Continued)_ ——————————

of separate orders on different grounds).  Exercising discretion, our Supreme Court in **General Electric** and this Court in **Egenrieder** refrained from quashal.   In those cases, however, all of the orders challenged on appeal were entered on the same docket numbers and the failure to file separate appeals did not raise jurisdictional concerns.  **See K.H.**, 826 A.2d at 871-872 & n.11 (appeal from interlocutory order is "treated as filed after [entry of judgment] and on the date thereof" under Pennsylvania Rule of Appellate Procedure 905(a) and such treatment resolves jurisdictional concerns).  By contrast, here, as in **C.M.K.**, the orders presented for appellate review were entered on different dockets.  In addition, as we have stated, Appellants' notice of appeal was not filed within 30 days of the summary judgment order in the 1902 action.   Hence, while **General Electric** and **Egenrieder** are instructive as to whether Rule 512 applies in this case, those decisions did not involve the jurisdictional concerns we have identified.

[26] As we shall discuss further, this did not constitute complete consolidation and Appellants' three separate actions retained their individual identities.

[27] Appellants do not categorize their appellate claims by docket number. Nevertheless, through a careful review of Appellants' brief and the certified record, we are able to identify the claims that relate to each case number.

action. Lastly, Appellants' first, second and sixth claims involve defendants sued in the 1902 action. For each of these reasons, we are persuaded, under **C.M.K.**, that Appellants needed to file separate notices of appeal at each case docket and that the timeliness of each notice must be determined in reference to the entry date of the challenged order. Applying this approach, we lack jurisdiction over any claim involving the defendants in the 1902 action.

In view of the trial court's August 24, 2010 order consolidating the three actions, however, we cannot end our inquiry at this juncture. We turn now to consider the impact of the court's consolidation order on our jurisdictional analysis. Pennsylvania Rule of Civil Procedure 213(a) provides that:

> In actions pending in a county which involve a common question of law or fact or which arise from the same transaction or occurrence, the court on its own motion or on the motion of any party may order a joint hearing or trial of any matter in issue in the actions, may order the actions consolidated, and may make orders that avoid unnecessary cost or delay.

Pa.R.C.P. 213(a).

As our Supreme Court has explained:

> [U]nder Rule 213(a), a trial court has three options where pending actions involve either a common question of law or fact, or which arise from the same transaction: (1) ordering a joint trial or hearing on any matter at issue; (2) ordering the actions "consolidated"; and (3) issuing other orders designed to avoid unnecessary costs or delay.

**Kincy v. Petro**, 2 A.3d 490, 493 (Pa. 2010).

- 16 -

There is a difference between consolidation under Rule 213(a) and "complete consolidation." As our Supreme Court explained,

> [S]eparate actions cannot be consolidated to the extent the actions lose their separate identities and become a single action[, *i.e.*,] "complete consolidation[,]"—unless the actions involve the same parties, subject matter, issues, and defenses.
>
> Although the language of Rule 213(a) suggests that a court may order actions consolidated when the actions involve a common question of law or fact, or arise from the same transaction or occurrence, . . . the second option for consolidation under Rule 213(a) . . . is distinct from [] complete consolidation.

***Kincy***, 2 A.3d at 494.

It is clear from the record that the trial court in this matter attempted to achieve complete consolidation of the 469, 1810, and 1902 actions. This is evidenced by the wording of the trial court's order. ***See*** Order of Consolidation, 8/24/10, at 1 (the actions "are hereby consolidated under [the 469 action]"). However, disapproving of ***Keefer v. Keefer***, 741 A.2d 808 (Pa. Super. 1999),[28] and other decisions of this Court, our Supreme

---

[28] In ***Keefer***, a wife filed two separate lawsuits against her husband which were eventually consolidated. ***Keefer***, 741 A.2d at 810. The trial court dismissed the one action but permitted certain counts of the other action to proceed. When addressing whether the dismissal of one of Wife's lawsuits was a final appealable order, this Court noted that "[a]n order affecting any one of those individual cases must be closely scrutinized to determine its finality. If such an order disposes of all claims and all parties in any single case, then the order is final and therefore proper for immediate appeal." ***Keefer***, 741 A.2d at 811 (internal quotation marks omitted; emphasis removed). This Court ultimately decided that the cases had been completely consolidated. ***Id.*** In ***Kincy***, however, our Supreme Court repudiated this Court's holding in ***Keefer*** that the actions had been completely consolidated because, although the parties were identical, the issues and claims were not
*(Footnote Continued Next Page)*

Court held that the language of a consolidation order is not controlling as to whether complete consolidation has occurred. *Kincy*, 2 A.3d at 496. Instead, our Supreme Court held that, even if a trial court's order appears to completely consolidate several cases, the order does not completely consolidate the cases unless the cases involve the same parties, subject matter, issues, and defenses. *Id.*

Since the present cases do not meet these criteria, complete consolidation was never achieved under the test set forth in *Kincy*. Moreover, because the cases retained their separate identities, it follows that Appellants needed to file timely notices of appeal at each docket (upon the entry of a final order) in order to invoke appellate jurisdiction. Since this did not occur in the 1902 action, *Kincy* leads to the conclusion that we lack appellate jurisdiction over all claims pertaining to that case. Again, however, we cannot end our analysis here.

This case was held internally after oral argument because this Court granted reargument in *Malanchuk v. Sivchuk*, 106 A.3d 789 (Pa. Super. 2014) (*en banc*). After this Court issued its *en banc* decision in

*(Footnote Continued)* ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

identical. Thus, *Keefer* also shows the interplay between complete consolidation and finality. Specifically, our Supreme Court's treatment of *Keefer* shows that cases retain separate identities where, despite identical parties, cases on different dockets have different claims, defenses, and issues.

***Malanchuk***, we ordered all parties to file letter briefs addressing the impact

of ***Malanchuk*** and ***Burkey v. CCX, Inc.***, 106 A.3d 736 (Pa. Super. 2014).[29]

In ***Malanchuk***, the plaintiff filed a complaint against Sivchuk alleging

claims sounding in negligence and products liability. ***Malanchuk***, 106 A.3d

at 791. Less than one year later, Malanchuk filed a separate action (in the

same court) against Tsimura, asserting claims for negligence and products

liability. ***Id.*** The actions were consolidated for trial. ***Id.*** Eventually, the

trial court granted summary judgment in favor of Tsimura on all of

Malanchuk's claims. ***Id.*** The trial court also granted summary judgment in

favor of Sivchuk on Malanchuk's products liability claims, but denied

summary judgment on Malanchuk's negligence claims. Malanchuk then

appealed the order granting summary judgment in favor of Tsimura to this

Court.

On appeal, Malanchuk argued, pursuant to ***Kincy***, that the order

granting summary judgment in favor of Tsimura was final and appealable

because, despite the trial court's consolidation order, the two actions did not

involve the same parties and thus retained their individual identities. This

---

[29] The Hospital and WVHCS argue that this case is distinguishable from ***Malanchuk*** because the claims filed in each of the three actions in the case at bar were distinct. This contention misses the mark. This Court's decision in ***Malanchuk*** rested only in part on the fact that the claims were similar. Instead, it relied upon the fact that the plaintiffs in both cases were identical and raised claims relating to a common set of facts. The plaintiffs in the 469, 1810, and 1902 actions were identical and all three cases arose out of the events of February 24 and 25, 2005. Thus, the Hospital and WVHCS' efforts to distinguish ***Malanchuk*** are unavailing.

Court disagreed and deemed the summary judgment order interlocutory, finding **Kincy** distinguishable. In reaching this conclusion, this Court reasoned that if our Supreme Court in **Kincy** had accepted the plaintiff's argument on consolidation and the merger of complaints, then it would have permitted amendment outside the statute of limitations. **Id.** at 795.[30] This Court also observed that, if Malanchuk had named both Sivchuk and Tsimura in a single complaint, there would be no question that the order granting Tsimura summary judgment would be interlocutory and unappealable. This Court saw no reason to treat that order any differently simply because the claims against each defendant were originally filed separately and then consolidated for trial pursuant to Rule 213(a). **Id.** Lastly, this Court said that **Kincy** did not deal with the issue of what constituted a final appealable

---

[30] Specifically, the **Malanchuk** Court concluded:

> Malanchuk's reliance on **Kincy** for the proposition that because the actions were consolidated under Rule 213, the claims against each defendant retained their separate identities, thereby rendering summary judgment for Tsimura a final order, expands **Kincy**'s application far beyond its holding and abrogates the definition of a final order. Key to understanding **Kincy** is that by the time the cases were consolidated, the statute of limitations had expired. The accident occurred on September 13, 2003. Kincy filed suit on August 3, 2005, and the cases were consolidated on March 7, 2006. If the **Kincy** court had accepted her argument regarding merger, it would have defeated the statute of limitations by effectively allowing her to amend her complaint to include an entirely new cause of action. Such a result would have created a loophole in the statute of limitations.

**Malanchuk**, 106 A.3d at 794-795 (internal citations and footnote omitted).

order.  **Id.**[31]  This Court therefore held in **Malanchuk** that when cases are consolidated under Rule 213(a), whether complete consolidation was achieved or not, an appealable order does not emerge until all claims against all parties in all consolidated actions have been resolved.

This Court's decision in **Malanchuk** complicates our jurisdictional analysis *vis-à-vis* the 1902 action since the present appeal raises issues that did not emerge in **Malanchuk** and that would not have emerged until Malanchuk resolved his claims against Sivchuk.  In other words, this case requires us to consider whether and how a plaintiff can eventually challenge the summary judgment order that dismissed his claims against a defendant **after** his claims in a companion case are resolved.  Appellants here challenge an adverse summary judgment ruling that was issued long before final orders were entered in the companion-consolidated cases.  Under **Malanchuk**, the trial court's summary judgment ruling in the 1902 action was interlocutory and unappealable when it was entered.  Now, however, final orders have been entered in the companion cases.  But, any appeal from the summary judgment order at the 1902 docket clearly falls outside the 30-day appeal period and, to the extent it is filed at the 1902 docket,

---

[31] Specifically, the **Malanchuk** Court concluded "**Kincy** is distinguishable on its facts and never addressed the issue of what constitutes a final appealable order.  **Kincy** involved the merger of complaints filed by separate plaintiffs, after the statute of limitations had expired."  **Malanchuk**, 106 A.3d at 795.

such an appeal challenges an order that was deemed "interlocutory" in **Malanchuk**.

The entry of the December 15, 2011 summary judgment order in the 1902 action resolved all claims against all parties in that action; hence, that order met all the criteria for "finality" because it terminated that action. In other words, no orders disposing of any claim and/or party could subsequently be entered in the 1902 action. **Malanchuk** assumes that a future order, in either the 469 or 1810 actions, is necessary to make the December 15, 2011 summary judgment order final with respect to the 1902 action. However, Pennsylvania Rule of Appellate Procedure 341 and this Court's decision in **C.M.K.** militate strongly against the conclusion that an order entered on one docket can transform an order entered on a separate docket into a final order. That is why separate notices of appeal are required where separate orders resolve the claims pending at separate dockets. Since the summary judgment order in the 1902 action cannot be made final by a future order entered on a different docket, the December 15, 2011 summary judgment order will forever be an interlocutory order.[32]

---

[32] Indeed, under Pennsylvania law, with the exception of orders that meet the criteria of Pennsylvania Rule of Appellate Procedure 341(b)(2) (orders defined as final by statute) or (b)(3) (orders entered as final following determination that immediate appeal would facilitate resolution of entire case) an interlocutory order never becomes a final order for purposes of appeal. Instead, non-final orders become reviewable on appeal only **after** the trial court enters a final order at that docket and the appellant files a timely notice of appeal. **See K.H.**, 826 A.2d at 870-871. **Malanchuk** cited

*(Footnote Continued Next Page)*

This case is different from those situations, typically arising in the criminal context, in which we say that a judgment of sentence can be "made final" by the entry of a subsequent order. For example, we have said that a judgment of sentence can be made final by the subsequent denial of a post-sentence motion, *see **Commonwealth v. Trinidad***, 96 A.3d 1031, 1032 (Pa. Super. 2014), *appeal denied*, 99 A.3d 925 (Pa. 2014), or by an order designating the defendant a sexually violent predator. ***See Commonwealth v. Hollingshead***, 2015 WL 745709, *1 (Pa. Super. Feb. 19, 2015). Notwithstanding these examples, however, we generally view a judgment of sentence as a final and appealable order within the context of a criminal litigation because it resolves all matters between the parties at a particular docket. The entry of such an order permits an immediate appeal. In the limited circumstances in which this is not the case, the appeal still lies from the judgment of sentence but must await the docketing of an order that resolves some ancillary issue(s), which then completes the prerequisites of finality. In either case, resolution of all claims against all parties at a particular docket remains the hallmark of a final, appealable order. Thus, even where we say that a judgment of sentence has been "made final" by a subsequent order, it is the entry of an order that resolves all claims **in that same case** that triggers the appellate procedures contemplated in

*(Footnote Continued)* _____

no authority for expanding this single-case principle to encompass multiple cases filed at multiple dockets.

Pennsylvania Rule of Appellate Procedure 341. *See* Pa.R.A.P. 341 (requiring separate notices of appeal at each docket to commence appeal process where more than one order resolves issues on more than one docket or relating to more than one judgment). Therefore, special situations that arise in the context of criminal litigation offer no basis to suggest that an order entered in one case can transform an order entered at another docket into a final and appealable determination.

Since we are reluctant to conclude that *Malanchuk* intended to entirely foreclose appellate challenges to litigants who find themselves in Appellants' situation, we are compelled to hold that *Malanchuk* permits an appeal from the summary judgment ruling in the 1902 action since Appellants filed timely notices following the entry of final orders in the companion-consolidated cases. The precise mechanisms and procedural justifications for such a conclusion are unclear, however.

It is evident that our holding in *Malanchuck* altered appellate practice in multi-docket cases where the trial court has ordered less-than-complete consolidation. Under *Kincy*, cases such as the one at bar plainly do not meet the requirements for complete consolidation because they lack identity of parties, subject matter, issues, and defenses. It would seem to follow, then, that a consolidation order could not strip them of their individual identities. It further follows that appellate review could be obtained in such instances only if the appellants filed timely notices of appeal at each docket

upon the entry of a final order. Since this did not occur in this case, **Kincy** would lead us to forego review of any claims involving the 1902 action.

**Malanchuk**, however, raises questions regarding this procedure in holding that an otherwise final order entered in a case consolidated solely for purposes of trial must await final resolution of all claims against all parties in all companion-consolidated cases before an appellate challenge can be lodged. It is unclear, for example, precisely what procedures this Court should allow in order to permit a litigant to pursue an appeal once final and appealable orders have been entered, as is the case in the present litigation. To illustrate this point, consider an example utilizing the facts in **Malanchuk**. Although the summary judgment order at issue in that case dismissed all claims against all parties at the Tsimura docket, this Court found that order to be "interlocutory" in nature. Any future appeal at the Tsimura docket would seem futile since a party cannot appeal from an interlocutory order and, as discussed above, an order entered on a separate docket is incapable of making that interlocutory order a final order.

Moreover, any notice appealing the summary judgment order in the Tsimura case filed after the resolution of Malanchuk's claims against Sivchuk would almost certainly extend beyond the 30-day appeal period. Assume, for example, that Malanchuk's claims against Sivchuk are resolved on August 1, 2016. Assume further that Malanchuk immediately files, at the Tsimura docket, a notice of appeal challenging the order granting summary judgment

in favor of Tsimura. That notice of appeal would be filed 1589 days after the entry of the March 26, 2012 summary judgment order. Since no appellate court in Pennsylvania enjoys the authority to extend the time for filing an appeal, **see** Pa.R.A.P. 105(b), it is difficult to conceive of a scenario in which Malanchuk could permissibly appeal the order dismissing his claims against Tsimura. If this Court saw a notice of appeal filed 1589 days after the last order entered on the docket, it would quash the appeal immediately.[33]

Lastly, as we have discussed above, it is unclear how a notice of appeal filed at the Sivchuk docket (and within 30 days of resolution of Malanchuk's claims against Sivchuk) could draw up for appellate review an order entered in the Tsimura litigation, given that such a practice clearly runs afoul of Pennsylvania Rule of Appellate Procedure 341 and our prior holding in **C.M.K.** This Court would quash an appeal challenging an order granting summary judgment in a case different from the one in which the notice of appeal was filed.

Notwithstanding these issues, we are bound by this Court's *en banc* pronouncement in **Malanchuk. See Commonwealth v. Tejada**, 2015 WL

---

[33] To further complicate matters, assume summary judgment was entered in favor of Malanchuk and against Tsimura in the Tsimura litigation. Pursuant to the holding in **Malanchuk**, that summary judgment order would be interlocutory and Tsimura could not appeal it until Malanchuk's case against Sivchuk ended. As Tsimura would no longer be involved in the litigation once summary judgment was entered against him, he would have to keep checking the docket in the Sivchuk case to see when a final order was entered in that case so that he could make sure to file a timely notice of appeal within 30 days.

62931 (Pa. Super. Jan. 6, 2015), *citing* Pa.R.A.P. 3103(b). Under ***Malanchuk***, we conclude that, while the 469, 1810, and 1902 actions were not completely consolidated within the meaning of ***Kincy***, no final and appealable order was entered in this case until September 3, 2013, the date that judgment was entered in favor of Liskov and Sapphire pursuant to the jury's verdict. As such, ***Malanchuk*** allows appellate review of Appellants' claims involving the 1902 action.

We next examine whether a final and appealable order was entered in the 469 action. As noted above, there was never a discontinuance filed, nor was judgment entered in relation to, Feschuk and the Ambulance Association in the 469 action. The Ambulance Association and Feschuk settled with Appellants on June 17, 2013. Instead of filing a discontinuance or a stipulated judgment, Feschuk and the Ambulance Association, on August 23, 2013, filed a supplemental new matter that raised the settlement as an affirmative defense. If the claims against Feschuk and the Ambulance Association are still pending, then a final appealable order has not been entered and this appeal is interlocutory in nature.

Pennsylvania Rule of Civil Procedure 229 provides, in relevant part:

(a) A discontinuance shall be the exclusive method of voluntary termination of an action, in whole or in part, by the plaintiff before commencement of the trial.

(b)(1) Except [in situations not applicable here], a discontinuance may not be entered as to less than all defendants except upon the written consent of all parties or leave of court after notice to all parties.

Pa.R.C.P. 229.

We find instructive the decision of this panel in **Burkey**. In that case, a stipulation of dismissal was filed on July 26, 2013. **Burkey**, 106 A.3d at 738. The trial court did not sign an order granting the stipulated dismissal until August 6, 2013. **Id.** Burkey's notice of appeal was timely if the appeal period began to run on August 6 but was untimely if the appeal period began to run on July 26. This panel held that the appeal period began to run on July 26 and, therefore, Burkey's notice of appeal was untimely. **Id.** at 739-741. Our determination was based on the fact that the filing of the stipulation disposed of all claims against all parties in that particular case. **See id.** at 741. Thus, we held that the mandates of Rule 229 were satisfied, despite the irregular form of the pleading filed with the court. **See id.**

As noted above, Feschuk and the Ambulance Association were the last parties remaining in the 469 action. Thus, when the settlement agreement between Appellants and Feschuk and the Ambulance Association was filed on August 23, 2013, all of the requirements of Rule 229 were satisfied and that ended the 469 litigation. Because a final order was entered in the 469 action, that case does not hinder appellate review.[34] Accordingly, we

---

[34] Our holding in **Malanchuk** arguably calls this conclusion into question. To demonstrate why this is so, recall our example above using the facts of **Malanchuk**. Assume further that, instead of dismissing Malanchuk's claims against Tsimura, the trial court's summary judgment order granted summary judgment in favor of Malanchuk. Assume further that Malanchuk
*(Footnote Continued Next Page)*

conclude that, despite the procedural irregularities present in the instant appeal, all claims against all parties in all three actions have been disposed of and we have jurisdiction to consider the merits of this appeal.

Having concluded that we possess jurisdiction over this appeal, we turn now to address the merits of Appellants' issues. In their first issue, Appellants contend that the trial court erred by granting summary judgment in favor of the Hospital.[35] This Court has explained:

> Our scope of review of an order granting summary judgment is plenary. We apply the same standard as the trial court, reviewing all the evidence of record to determine whether there

*(Footnote Continued)* ——————

ultimately resolved his claims against Sivchuk through a negotiated settlement. Rule 229 requires the written consent of all parties or leave of court after notice to all parties before a discontinuance can be entered as to less than all defendants. Ostensibly, one of the reasons underlying this rule is to give non-settling parties notice of the impending entry of an order that could affect their rights, including their appellate rights. By linking the finality and appealability of the Tsimura litigation to the resolution of the Sivchuk litigation, **Malanchuk** arguably expands the scope of the notice and consent obligations found in Rule 229 to include parties to all companion-consolidated cases. In the absence of such a duty, then a party in Tsimura's position would have no notice that his appeal period had begun to run.

In this case, no other party's appellate rights were impacted by the fact that notice of Appellants' settlement with Feschuk and Ambulance Association was not given to all litigants in all of the companion-consolidated cases. Thus, we find that the requirements of Rule 229 were met here.

[35] The Hospital and WVHCS make various waiver arguments throughout their brief regarding Appellants' alleged failure to comply with Pennsylvania Rule of Appellate Procedure 2119. As we have not been hindered by Appellants' brief, we decline to find waiver in our discretion. *See Allegheny Office of Med. Exam'r v. Unemployment Comp. Bd. of Review*, 2011 WL 10845681, *2 n.4 (Pa. Cmwlth. Mar. 17, 2011).

exists a genuine issue of material fact. We view the record in the light most favorable to the non-moving party, and all doubts as to the existence of a genuine issue of material fact must be resolved against the moving party. Only where there is no genuine issue as to any material fact and it is clear that the moving party is entitled to a judgment as a matter of law will summary judgment be entered.

*Stein v. Magarity*, 102 A.3d 1010, 1013 (Pa. Super. 2014) (internal alterations and citation omitted).

Appellants' complaint included three counts against the Hospital[36] – negligence, vicarious liability, and NIED.[37] The trial court found that the negligence and vicarious liability actions were barred by this Court's decision in *Riffe v. Vereb Ambulance Serv., Inc.*, 650 A.2d 1076 (Pa. Super. 1994). In *Riffe*, the medical command physician at the hospital ordered an emergency medical technician to administer a certain drug. *Id.* at 1076-1077. The emergency medical technician administered 44 times the normal dose of the drug, resulting in the patient's death. *Id.* Eventually, a lawsuit was filed against the emergency medical technician, ambulance service, and hospital alleging that all three had been negligent with respect to the patient's care. The claim against the hospital was based upon the actions of the medical command physician.

---

[36] As WVHCS is the parent company of the Hospital, we need not address Appellants' claims against WVHCS separately.

[37] We address the NIED claim against the Hospital *infra* when discussing that claim against all defendants.

The emergency medical technician and ambulance service settled with the plaintiffs. *Id.* at 1077. The case against the hospital went to trial; however, the trial court granted a motion for a compulsory nonsuit. *Id.* On appeal, this Court was asked to consider whether "the hospital had an independent, primary[,] and concurrent duty of care to the deceased pre-hospital patient[.]" *Id.* (internal quotation marks omitted). After review of the Emergency Medical Services Act, 35 P.S. §§ 6921–6938 (repealed),[38] and implementing regulations, we concluded that there was no duty on the part of the hospital. *Riffe*, 650 A.2d at 1077-1079.

In order to prevail on a negligence claim the plaintiff must prove that (1) the defendant owed a duty; (2) the defendant breached that duty; (3) the breach was the proximate result of harm; and (4) the damages were a direct result of that harm. *Fessenden v. Robert Packer Hosp.*, 97 A.3d 1225, 1229 (Pa. Super. 2014). Under *Riffe*, the Hospital did not owe a duty to Ashley or Appellants. Therefore, Appellants failed to prove their *prima facie* case of negligence.

Appellants attempt to distinguish *Riffe* by arguing that it differs from the case *sub judice* because the plaintiffs in *Riffe* were seeking damages based upon the actions of the emergency medical technician while in the

---

[38] The Emergency Medical Services Act was repealed on August 18, 2009. *See* 2009 P.L. 308. That statute, however, still governs this action. *See Wimer v. Pa. Employees Benefit Trust Fund*, 939 A.2d 843 (Pa. 2007) (substantive rights are governed by the law in place at the time of an incident).

case *sub judice* Appellants are seeking damages based upon the actions of Liskov, the medical command physician. This Court's holding in **Riffe**, however, is much broader than the facts of that case. This Court held that a hospital does not owe a duty to patients before their arrival at the care giving facility. The case at bar fits squarely within that holding as Appellants are arguing that the Hospital owed a duty to Ashley, a pre-hospital patient.

Appellants also argue that, irrespective of the Emergency Services Act, the Hospital assumed responsibility for the medical command physician. A medical command, by definition, is part of a hospital. **See** 28 Pa.Code 1001.2 (repealed).[39] However, Appellants' contention that the Hospital is liable for the actions of Liskov, the medical command physician, because the medical command is part of the Hospital stands in direct contravention of this Court's decision in **Riffe**. Indeed, this circumstance was present in **Riffe** but did not alter our conclusion in that case; hence, it cannot impact our analysis here. Finally, we reject Appellants' public policy argument. Appellants would have recovered against Liskov and Sapphire if they had been able to prove that Liskov had been grossly negligent. As such, Appellants were not completely foreclosed from seeking damages for the conduct of the medical command. Accordingly, the trial court properly granted summary judgment as to count V (negligence) in the 469 action.

_____

[39] The regulations promulgated under the Emergency Services act were repealed upon the repeal of the Emergency Services Act. However, the regulations were binding at the time this incident occurred.

As to count VI (vicarious liability), any error in granting summary judgment to the Hospital was harmless. Our Supreme Court has held that "termination of the claim against the agent extinguishes the derivative claim against the principal." ***Mamalis v. Atlas Van Lines, Inc.***, 560 A.2d 1380, 1383 (Pa. 1989). Appellants' vicarious liability claim was based upon the alleged negligence of Liskov, the medical command physician, and Sapphire, her employer. The jury determined that Liskov and Sapphire were not grossly negligent and, therefore, the vicarious liability claim against the Hospital would have been extinguished at the end of the trial if summary judgment were not granted.

In their second issue on appeal, Appellants argue that the trial court erred by granting summary judgment to all defendants with respect to Linda Judge's NIED claim. In order to recover on her NIED claim, Linda Judge was required to prove that (1) the defendants negligently injured Ashley; (2) Linda Judge was near the scene of the traumatic event; (3) the distress resulted from her observation of the traumatic event **and** the negligence of the defendant; (4) she had a close relationship with Ashley; and (5) that the emotional distress caused physical harm. ***See Sonlin ex rel. Sonlin v. Abington Mem'l Hosp.***, 748 A.2d 213, 217 (Pa. Super. 2000). The trial court found that Linda Judge was unable to prove the third element of NIED because she did not observe the alleged negligent actions of the defendants.

The entirety of Appellants' brief addressing Linda Judge's NIED claim focuses on how Linda Judge witnessed the alleged negligent actions of Picton, Feschuk, and the Ambulance Association. These three defendants, however, settled with Appellants. That settlement released Picton, Feschuk, and the Ambulance Association from **all** liability relating to the events that occurred on February 24 and 25, 2005. Therefore, Appellants are required to show that Linda Judge observed the negligent acts of Liskov, Sapphire, the Hospital, and WVHCS in order to recover on her NIED claim.

Linda Judge testified at her deposition that she did not see nor hear any actions taken by the Hospital, WVHCS, Liskov, or Sapphire. **See** N.T., 7/18/08, at 49-70. Instead, she only observed the alleged negligent actions of Picton, Feschuk, and the Ambulance Association. **See id.** Although Linda Judge observed the injury allegedly caused by the negligent conduct of Liskov, Sapphire, WVHCS, and the Hospital (*i.e.*, the death of Ashley), the law in this Commonwealth is clear that viewing the resulting injury is insufficient to recover on a NIED claim. Instead, the plaintiff must view both the negligent act and the resulting injury in order to recover on a NIED claim.

Our decision in **Love v. Cramer**, 606 A.2d 1175 (Pa. Super. 1992), *appeal denied*, 621 A.2d 580 (Pa. 1992), confirms this conclusion. In **Love**, this Court discussed how the plaintiff's observation of both the negligent action and the resulting injury to her loved one permitted her NIED claim to

survive preliminary objections. *Id.* at 1178-1179. This Court noted that "[a]lthough it seems odd that the plaintiff must actually witness the negligent act itself and not just the resulting traumatic injury to the loved one, the law as it now stands dictates such a requirement." *Id.* at 1179 n.4; *see also id.* at 1179 (Del Sole, J. concurring) (recognizing that a plaintiff must observe the negligent act itself in order to recover on a NIED claim but expressing disagreement with that rule).

The rule requiring observation of both the negligent act and resulting harm was first announced by this Court in ***Bloom v. Dubois Reg'l Med. Ctr.***, 597 A.2d 671 (Pa. Super. 1991). In ***Bloom***, this Court observed that often in NIED actions, the negligent action and the resultant injury occur simultaneously, thereby negating the need to define exactly what the plaintiff must observe in order to recover on their NIED claim. *Id.* at 682. However, in ***Bloom*** the negligent action and the resulting injury did not occur simultaneously. Thus, this Court had to determine exactly what the plaintiff had to observe in order to recover on a NIED claim. This Court held that in order to recover on a NIED claim, the plaintiff must observe the negligent action taken by the defendant as well as any resulting injury. *Id.*

In ***Tiburzio-Kelly v. Montgomery***, 681 A.2d 757 (Pa. Super. 1996), *superseded on other grounds*, 23 Pa.C.S.A. § 1901(a), this Court again emphasized the requirement that a plaintiff observe the negligent action itself in order to recover for NIED. ***Tiburzio-Kelly***, 681 A.2d at 773

- 35 -

(citation omitted). Nowhere in Appellants' brief is it averred that Linda Judge observed the alleged negligent actions of WVHCS, the Hospital, Liskov, and/or Sapphire. As there was no material issue of fact at issue regarding whether Linda Judge could satisfy the third element required for NIED, the trial court properly granted summary judgment to Liskov, Sapphire, WVHCS, and the Hospital.[40]

In their third issue on appeal, Appellants contend that the trial court erred by denying their motion *in limine* with respect to mononucleosis. Specifically, Appellants sought to preclude any mention at trial that Ashley had undiagnosed mononucleosis at the time of the incident. On May 15, 2013, the trial court denied Appellants' motion *in limine*. "When reviewing a ruling on a motion *in limine*, we apply an evidentiary abuse of discretion standard of review. The admission of evidence is committed to the sound discretion of the trial court and our review is for an abuse of discretion." **Commonwealth v. Parker**, 104 A.3d 17, 21 (Pa. Super. 2014) (citation omitted).

Appellants first argue that the evidence of undiagnosed mononucleosis was not relevant. "Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Pa.R.Evid. 401.

---

[40] We decline to address whether the trial court erred by granting summary judgment with respect to Picton, Feschuk, and the Ambulance Association as that issue was mooted by Appellants' settlement with those defendants.

Liskov and Sapphire, on the other hand, argue that the undiagnosed mononucleosis was relevant both to negligence and causation.

We conclude that the trial court did not abuse its discretion in determining that the undiagnosed mononucleosis was relevant to causation. Dr. Mark Cipolle, Liskov and Sapphire's expert witness, testified that Ashley was going to die no matter what decisions were made and what care was administered prior to her arrival at a hospital. **See** N.T., 6/15/13, at 432[41] ("[E]ven if [Ashley] had been brought directly to [the Hospital,] she would have . . . still died from the splenic hemorrhage."). This opinion was based, in part, on the fact that Ashley's spleen ruptured as a result of her fall down the stairs. As Appellants' own expert noted, mononucleosis is "a virus that infects . . . lymphatic tissue. And a lot of that tissue lives in the spleen. So the spleen gets much, much more swollen, and the membrane of the spleen gets a little bit spongy. So it doesn't take too much trauma to make it rupture." N.T., 6/11/13, at 124.

Thus, whether Ashley had mononucleosis was relevant to the issue of causation. Expert testimony showed that mononucleosis may have caused Ashley's spleen to become swollen and spongy before her fall down the stairs. That meant that any small trauma, such as the accident here, was sufficient to rupture the spleen. The spleen rupture, according to the

_____

[41] The notes of testimony for the entire trial are contained in one volume. We cite the proper date and the page number as outlined in the single volume of testimony.

defense expert, meant that Ashely would have perished no matter what actions were taken by the defendants.

Appellants next contend that even if mononucleosis were relevant, their motion *in limine* should have been granted pursuant to Pennsylvania Rule of Evidence 403.[42]  Rule 403 provides that, "The court may exclude relevant evidence if its probative value is outweighed by a danger of . . . unfair prejudice[.]"  Pa.R.Evid. 403.  "Unfair prejudice supporting exclusion of relevant evidence means a tendency to suggest decision on an improper basis or divert the jury's attention away from its duty of weighing the evidence impartially."  **Parr v. Ford Motor Co.**, 2014 WL 7243152, *9 (Pa. Super. Dec. 22, 2014) (*en banc*) (internal quotation marks and citations omitted).

Appellants contend that the low probative value of the mononucleosis evidence and the prejudice associated with allowing the jury to speculate regarding the standard of care or causation means that the balance tips against admission.  We disagree.  As discussed above, the evidence was relevant.  Furthermore, it was not unduly prejudicial for the jury to hear

---

[42] Liskov and Sapphire argue that Appellants' argument is waived as it wasn't raised in the trial court.  Appellants' motion *in limine*, however, specifically argued that the mononucleosis evidence should be excluded under Rule 403.  Motion *In Limine* To Preclude Defendants From Making Any Reference To and/or Introducing Evidence of Mononucleosis, 4/22/13, at 3 ("Moreover, even relevant evidence may be excluded if its probative value is outweighed by the danger of unfair prejudice.  **See** Pa.R.E[vid]. 403.").  Accordingly, Appellants complied with Rule 103 by specifying the grounds for their objection in the trial court.  **See** Pa.R.Evid. 103(a)(1)(B).

about an undiagnosed medical condition which contributed to Ashley's fatal injuries. Although the evidence may have been detrimental to Appellants, that does not make it unfairly prejudicial. The admission of Ashley's undiagnosed mononucleosis did not suggest an improper basis for decision or divert the jury's attention from fairly weighing the evidence. Accordingly, we conclude that the trial court did not abuse its discretion by denying Appellants' motion *in limine* with respect to mononucleosis.

In their fourth issue on appeal, Appellants argue that the trial court erred by including Feschuk on the verdict slip. We review a claim that the trial court erred by including or excluding settling defendants on the verdict slip for an abuse of discretion. ***See Hyrcza v. W. Penn Allegheny Health Sys., Inc.***, 978 A.2d 961, 968 (Pa. Super. 2009). A trial court does not abuse its discretion by permitting a settling defendant to be included on the verdict slip if the evidence presented at trial was sufficient to meet the *prima facie* burden of proving that the settling defendant was liable. ***See id.*** at 968-969.

We first note that Appellants' whole argument is premised on the assumption that Feschuk, at the time of trial, was a settling defendant. This, however, was not the case. Feschuk was still a party to the case until August 23, 2013, when Feschuk, the Ambulance Association, and Picton filed a supplemental new matter which included as an attachment thereto a copy

of the signed settlement agreement.    Thus, Appellants argument fails because Feschuk was not a settling defendant.[43]

Even if we considered Feschuk to be a settling defendant, we would conclude that there was a *prima facie* case of Feschuk's gross negligence. **See** 35 P.S. § 6931 (repealed) (requiring evidence of gross negligence).[44] Appellants' expert witness testified that Feschuk breached his duty of care and that this breach of his duty of care led to Ashley's death.  **See** N.T., 6/11/13, at 129-132.    This testimony was very similar to the testimony relied upon by Appellants to show that Liskov was grossly negligent. **Compare id.** *with* **id.** at 104-109. If Appellants satisfied their *prima facie* burden with respect to Liskov then certainly a *prima facie* case of gross negligence was shown as to Feschuk.    Accordingly, the trial court did not error by keeping Feschuk on the verdict slip.

In their fifth issue on appeal, Appellants argue that the trial court erred by denying their motion for a new trial based upon jury irregularities. Specifically, Appellants contend that the second alternate juror impermissibly informed the 12 regular jurors that he believed they should

---

[43] Even if we were to use the date the settlement agreement was signed, we would come to the same conclusion.  The settlement agreement is dated June 17, 2013 – the same day the jury returned its verdict in this case. There is no evidence of record that the settlement agreement was entered into prior to the jury being sent out to deliberate.

[44] **See** note 38, **supra**.

return a verdict in favor of Liskov and Sapphire. The trial court denied Appellants' post-trial motion but offered no explanation of its ruling.

In support of their argument that there was an extraneous influence on the jury, Appellants attached to their post-trial motion a document entitled "AFFIDAVIT." Post-Trial Motion, 6/27/13, Exhibit 4. That document states that Dr. Gregory Bradshaw, Appellants' jury consultant, discussed the case with six jurors after the verdict was announced. It does not list the names of the jurors with whom Bradshaw spoke. Instead, it lists the juror numbers of the six individuals. The document states that Bradshaw informed the jurors that he was recording the conversation. The document also states that he made the recording available to Appellants' counsel after the meeting. The document does not relay the content of Bradshaw's conversation with the jurors. The signature and seal of a Texas notary public appears at the bottom of the document. Also attached to Appellants' post-trial motion was an alleged copy of the recording of Bradshaw's conversation with the jurors and a purported transcript thereof.

On appeal, Liskov and Sapphire argue that the document submitted by Appellants in support of their post-trial motion was not an affidavit. They also argue that the attached transcript did not comply with the rules of judicial administration relating to transcripts. Liskov and Sapphire argue that the speakers in the audio recording were not under oath nor were they told that their testimony would be used to attack the validity of their verdict.

Finally, Liskov and Sapphire argue that even if there were an extraneous influence on the jury that it was not prejudicial to Appellants.

The right to a trial by an impartial jury "as preserved in the Seventh Amendment of the United States Constitution, is enshrined in the Pennsylvania Constitution, and the constitutional right to a jury trial, as set forth in [Article 1, Section 6] does not differentiate between civil cases and criminal cases." **Pisano v. Extendicare Homes, Inc.**, 77 A.3d 651, 662 (Pa. Super. 2013), *appeal denied*, 86 A.3d 233 (Pa. 2014), *cert denied*, 134 S. Ct. 2890 (2014) (internal quotation marks and citation omitted). "It is fundamental that every litigant who is entitled to a jury trial is entitled to an impartial jury, free to the furthest extent practicable from extraneous influences that may subvert the factfinding process." **Carter by Carter v. U.S. Steel Corp.**, 604 A.2d 1010, 1015 (Pa. 1992) (citation omitted).

Determining if a new trial is warranted because of an extraneous influence is a two-step process. First, the trial court must determine whether there is competent evidence that there was an extraneous influence on the jury. **See Bruckshaw v. Frankford Hosp. of Phila.**, 58 A.3d 102, 114 (Pa. 2012). Appellants argue that any extraneous influence on the jury is *per se* prejudicial. This is incorrect. In **Bruckshaw**, our Supreme Court held that "in situations where there [is] unauthorized contact with the jury or a juror" appellate courts "defer[] to the trial court's discretionary finding of [] prejudice based on competent record evidence[.]" **Id.** at 114. Thus,

the second step of the inquiry is whether an extraneous influence was prejudicial.

We first examine whether there was competent evidence of record that there was an extraneous influence on the jury. In **Carter**, our Supreme Court examined whether a trial court could consider testimony by a juror regarding the existence of an extraneous influence when determining whether to grant a motion for a new trial. Our Supreme Court reiterated that Pennsylvania follows the majority rule and prohibits juror testimony regarding the content of deliberations. **Carter**, 604 A.2d at 1013, *citing* ***Pittsburgh Nat'l Bank v. Mut. Life Ins. Co. of N.Y.,*** 425 A.2d 383 (Pa. 1981). There is, however, a narrow exception which permits juror testimony regarding whether "prejudicial information not of record and beyond common knowledge and experience was improperly brought to the jury's attention[.]" Pa.R.Evid. 606(b)(2)(A).

Liskov and Sapphire argue that the document signed by Bradshaw was not proper evidence as it was not an actual affidavit.

An affidavit is defined as:

a statement in writing of a fact or facts, signed by the person making it, that either (1) is sworn to or affirmed before an officer authorized by law to administer oaths, or before a particular officer or individual designated by law as one before whom it may be taken, and officially certified to in the case of an officer under seal of office, or (2) is unsworn and contains a statement that it is made subject to the penalties of 18 Pa.C.S.[A.] § 4904 relating to unsworn falsification to authorities.

Pa.R.C.P. 76.

Under Texas law, a notary public is authorized to administer oaths. **See** Tex. Govt. Code § 416.016(a)(3). Liskov and Sapphire argue this is insufficient to make the document an affidavit because it does not say that it is given under the pain of perjury. Liskov and Sapphire confuse an unsworn statement pursuant to 18 Pa.C.S.A. § 4904 with a sworn statement in writing made before an officer authorized to administer oaths. **See** Pa.R.C.P. 76. An affidavit need only be sworn to or affirmed before an individual authorized to administer oaths. **See Coulter v. Dep't of Pub. Welfare**, 65 A.3d 1085, 1087 n.4 (Pa. Cmwlth. 2013), *citing* **Commonwealth v. Thomas**, 908 A.2d 351, 354 (Pa. Super. 2006). On the other hand, an unsworn declaration is required to include specific language establishing it as having been given under the pain of perjury. **See** 18 Pa.C.S.A. § 4904; Pa.R.C.P. 76; **Coulter**, 65 A.3d at 1087 n.4; **Thomas**, 908 A.2d at 354. The law in Texas is the same. **See In re K.M.L.**, 443 S.W.3d 101, 109–110 (Tex. 2014) (citation omitted). In this case, the document executed by Bradshaw was signed by a Texas notary public and, therefore, complied with the provisions of Texas and Pennsylvania law relating to affidavits. Accordingly, it is an affidavit.

Although Bradshaw's document was an affidavit, Liskov and Sapphire also argue that Exhibit 5 to Appellants' post-trial motion, a transcript of the conversation between Bradshaw and the jurors is inadmissible as it does not

conform to the rules of judicial administration regarding transcripts.[45] We need not address whether the transcript complies with the rules of judicial administration, however, as the actual audio recording was attached to the post-trial motion. Instead, we must determine whether the audio recording itself provided admissible evidence that could be considered by the trial court when determining if extraneous influences impacted the jury's deliberations.

The recording appears to begin in the hall of the courthouse with Bradshaw asking if anyone would like to speak about the case. A few individuals can be heard agreeing to speak about the case. It appears that they then enter the courtroom and discuss the trial. At one point in the conversation, an individual states that the jurors asked the second alternate his thoughts on the case before he left in order to not "discount" what he was going to do.[46] An individual also states that the alternate juror said that he was for the defense. There is no further discussion about what the second alternate juror said. For example, there is no indication that the

---

[45] In particular, the transcript does not have a cover page nor does it have a signature page identifying who transcribed the recording and attesting to the accuracy of the transcript. The transcript also does not have a table of contents. Finally, the transcript only differentiates between Bradshaw and "Speaker." It does not identify the different speakers, noting only that it was an individual other than Bradshaw speaking. In other respects, it appears to be a typical transcript.

[46] This was an apparent reference to the jury wanting to consider the second alternate's views of the case.

second alternate juror relayed his opinion on a specific issue, the credibility of a certain witness, or the weight of any particular piece of evidence. The notes of testimony indicate that the second alternate juror stayed for closing arguments and then was dismissed prior to the jury charge. **See** N.T., 6/17/13, at 607, 670. Thus, Appellants hypothesize, the latest that he could have told the jury panel his views was after the closing arguments and before the jury charge.

In **Carter**, our Supreme Court stated that a trial court should only reach the prejudice prong of an extraneous influence inquiry if "the existence of a potentially prejudicial extraneous influence has been established by **competent testimony**[.]" **Carter**, 604 A.2d at 1016 (emphasis added). The use of the phrase "competent testimony" indicates that unauthenticated testimony, such as the type that is present in the instant case, is insufficient to prove the existence of an extraneous influence. To that end, in **Carter** our Supreme Court relied upon testimony given by the jurors, under oath, to the trial court *in camera*. **Id.** at 1013.

Competent evidence has been required to prove an extraneous influence for at least 190 years. In **Ritchie v. Holbrook**, 7 Serg. & Rawle 458 (Pa. 1821), our Supreme Court considered whether an affidavit from a juror was sufficient evidence to find that an extraneous influence had impacted the jury's deliberations. The affidavit alleged that the jury foreperson had told the rest of the jury that he had a conversation with the

plaintiff in which the plaintiff was able to explain an apparent hole in his trial testimony. *Id.* The plaintiff objected to this affidavit being considered because it was hearsay. *Id.* Our Supreme Court determined that it was not hearsay because the affidavit was offered to establish that the jury foreperson told the remaining jurors of an alleged conversation, not for the truth of the conversation between the jury foreperson and the plaintiff. *Id.* As far as this case is concerned, *Richie* stands for the proposition that the evidence used to prove an extraneous influence must comport, at least in some respects, with the rules of evidence.

In *Friedman v. Ralph Bros.*, 171 A. 900 (Pa. 1934), our Supreme Court stated, "Only in clear cases of improper conduct by jurors, evidenced by **competent testimony**, should a verdict, which is fully supported by the evidence, be set aside and a new trial granted." *Id.* at 901 (emphasis added). Our Supreme Court relied upon testimony given by the jurors, under oath in the presence of the trial court, in determining that an extraneous influence was present. *See id.* Similarly, in *Welshire v. Bruaw*, 200 A. 67 (Pa. 1938) (*per curiam*), our Supreme Court affirmed the grant of a new trial based upon testimony, given under oath, that the trial court's tipstaff pressured the jury into delivering a verdict even though it had not finished deliberations. *Id.*

Finally, in *Commonwealth v. Sero*, 387 A.2d 63 (Pa. 1978), our Supreme Court held that Juror A was able to testify regarding information

that Juror B had communicated to the full jury. Juror B had learned the information from her husband. *Id.* at 66-67. The testimony that our Supreme Court found sufficient to conclude that an extraneous influence impacted the jury's deliberations was once again deposition testimony, given under oath. *Id.* at 66.

The common theme of all of these cases involving jury irregularities is that the moving party must produce admissible, authenticated evidence to support its motion. Although the exact nature of the evidence differs, the consistent feature of the evidence advanced in support of the request for a new trial is that there is no dispute about who is giving the evidence or what was said. Contrast that to the case at bar in which there is a genuine issue as to: whether the tape recording in question is a true and accurate copy of Bradshaw 's conversation; whether the individuals speaking were actually trial jurors; and whether those jurors would have said the same things under oath.

As this Court has stated, in order to authenticate a recording there must be evidence from "a witness with personal knowledge who can testify that it fairly and accurately represents that which it purports to depict." *Commonwealth v. McKellick*, 24 A.3d 982, 995 (Pa. Super. 2011), *appeal denied*, 34 A.3d 828 (Pa. 2011) (internal quotation marks and citations omitted); *see Commonwealth v. Fisher*, 764 A.2d 82, 89 (Pa. Super. 2000), *appeal denied*, 782 A.2d 542 (Pa. 2001) (citation omitted) ("Tape

recordings are admissible when they are properly identified as a reproduction of what has been said and the voices are properly identified.").

In this case, the recording has not been authenticated. Although Bradshaw states that he made a recording and then gave the recording to counsel, there is no indication, either by Bradshaw or Appellants' counsel, that the recording attached to Appellants' post-trial motion was a true and correct copy of the recording made by Bradshaw. Furthermore, there was no evidence that the voices in the recording are actually the voices of six of the jurors who served in this case. There is no information as to the identity of the speakers on the recording. As such, the audio recording attached to the post-trial motion was not properly authenticated and therefore could not be considered by the trial court.[47]

Thus, Appellants are only left with Bradshaw's affidavit to support their claim of jury irregularities. This affidavit says absolutely nothing regarding extraneous influences impacting the jury's deliberation process. Furthermore, Appellants did not seek an evidentiary hearing before the trial court to produce further evidence relating to the alleged jury irregularities. Appellants could easily have proffered affidavits executed by one (or more) of the trial jurors that attested to the alleged statements made by the

---

[47] As the recording itself was not properly authenticated, the transcript of the recording would also be inadmissible if Appellants overcame the problems inherent with the transcript.

second alternate juror. They also could have deposed the jurors or requested an evidentiary hearing where they subpoenaed one or more trial jurors to testify. They chose not to take these routes and instead rested on the affidavit of Bradshaw along with the inadmissible recording (and transcript thereof). As such, Appellants have failed to meet the first requirement for relief – proving by competent evidence that an extraneous influence impacted the jury.[48] Accordingly, we conclude that the trial court did not abuse its discretion in denying Appellants' post-trial motion relating to alleged jury irregularities.

In their final issue on appeal, Appellants allege that the trial court erred by granting summary judgment with respect to their claims for punitive damages. However, "[a] request for punitive damages does not constitute a cause of action in and of itself. Rather, a request for punitive damages is merely incidental to a cause of action." **Feingold v. SEPTA**, 517 A.2d 1270, 1276 (Pa. 1986). In this case, even if Appellants asserted causes of action that may have allowed for punitive damages, Appellants did not prevail on any of their causes of action and therefore they could not be

---

[48] Even if we were to conclude that Appellants had proved the existence of an extraneous influence on the jury, we would conclude that they are not entitled to relief on this claim. As noted above, the second alternate juror did not offer his views on specific facts in question. Instead, he only offered his opinion that he favored the defendants. It is inconceivable that the entire jury decided to find for the defense solely because of one alternate juror's general inclination. Thus, Appellants would be unable to prove the necessary prejudice to succeed on their juror irregularity claim.

entitled to punitive damages. Accordingly, any error in granting summary judgment on the punitive damages claims early in the litigation was harmless.

In sum, we conclude that we have jurisdiction over this matter. Turning to the merits, Appellants are not entitled to relief. The trial court properly granted summary judgment in favor of the Hospital and WVHCS under **Riffe**. The trial court properly concluded that, since Linda Judge did not observe the alleged negligent actions of Liskov, Sapphire, WVHCS, and the Hospital, she could not recover on her NIED claim. Whether the trial court erred by granting summary judgment to Feschuk, Picton, and the Ambulance Association on Linda Judge's NIED claim is now moot in view of Appellants' settlement with these defendants. The trial court did not abuse its discretion by denying Appellants' motion *in limine* relating to Ashely's undiagnosed mononucleosis. As Feschuk was still a party to the case, the trial court did not err by including him on the verdict form. Appellants failed to come forward with competent evidence that there had been jury irregularities. Finally, any error in granting summary judgment as to the punitive damages claims was harmless. We therefore affirm the judgments entered in these three actions.

Judgments affirmed.

President Judge Emeritus Ford Elliott joins this memorandum.

Judge Strassburger files a Concurring Memorandum.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 5/18/2015